**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| EXXON MOBIL CORPORATION,<br><br>                Plaintiff,<br><br>        - against -<br><br>UNITED STATES OF AMERICA,<br><br>                Defendant. | CIVIL ACTION NO. |

**COMPLAINT**

1.      This case concerns the federal government's improper and unlawful tax treatment of an oil and gas partnership and that partnership's decision to finance its business venture with debt.  The United States of America, acting through the Commissioner of the Internal Revenue Service (the "**IRS**"), has not respected that partnership and debt and has erroneously collected taxes and assessed penalties that were not owed for tax years 2010 and 2011.  Plaintiff Exxon Mobil Corporation ("**ExxonMobil**") seeks by this action a refund of that money and other taxes, penalties, and interest wrongly collected by the IRS.

2.      Through their partnership, Al Khaleej Gas or "**AKG**," ExxonMobil and the State of Qatar ("**Qatar**") have worked together for years to explore and develop certain off-shore natural gas reservoirs in the North Field, one of the world's largest natural gas fields.  AKG has produced, marketed, and sold hundreds of millions of cubic feet of natural gas per day, with annual revenues in the billions of dollars.

3.      AKG received substantial contributions from each partner, and the partners engaged in significant joint activities.  Qatar contributed its interests in specified

volumes of natural gas from the reservoirs; associated rights to produce, process, market, transport, and sell the gas and associated products; and know-how to market the gas and associated products and to manage AKG.  ExxonMobil contributed billions of dollars in capital to develop those reservoirs and the infrastructure and know-how necessary to process and market the gas and associated products and to manage AKG.

4.    Since entering into the partnership, ExxonMobil and Qatar have jointly managed the resulting business and marketed the gas.  A joint management committee, consisting of members from ExxonMobil and Qatar, has been responsible for the management and strategic direction of the partnership since inception, and ExxonMobil and Qatar negotiate sales of gas together.  That joint structure was a deliberate and central component of the parties' commercial arrangement.  ExxonMobil had, and continues to have, a strong interest in having a meaningful role in AKG's management and marketing given its large investment of upfront capital.  And Qatar's significant, hands-on role in the management and marketing of the venture reflects Qatar's strategic interest, among other things, in meaningfully overseeing its investment in the partnership, supplying gas for domestic use in Qatar, and developing commercial relationships throughout the region.

5.    The partners also shared in AKG's profits and losses, as they intended from the outset.  AKG has produced billions of cubic feet of gas, and each partner has taken meaningful profit shares over the years depending on revenues, costs, and volumes of gas produced and sold.  The partners agreed that they would also share the corresponding risks arising from potential lack of demand, economic downturn, loss of production, delay, cost overruns, or other major adverse events.

6.      For these reasons and others, AKG is a partnership under applicable federal income tax law.

7.      In 2006, ExxonMobil and Qatar expanded and restructured AKG, more than doubling AKG's output through Qatar's contribution of interests in additional natural gas in the North Field and the agreement to build new infrastructure to increase production.  As an integral part of the amended agreement governing AKG, the parties recapitalized Qatar's existing equity share in AKG.  Rather than taking solely a profit share, Qatar took a reduced profit share and a production payment carved out of all of AKG's gas interests.  A production payment is a well-established form of financing that has been used in the oil and gas industry for decades and that constitutes debt under federal tax law and regulations.

8.      Under the amended agreement, Qatar receives production payments on a fixed schedule, at a fixed interest rate, out of the value of the natural gas produced from the reservoirs.  Such payments are to be made until the agreed-upon principal amount and interest are fully paid.  Through the recapitalization, Qatar relinquished a portion of its equity interest and received interests that were different in form and value from its profit share—a prioritized and transferable stream of scheduled payments from the mineral, coupled with potential additional upside payments that, in light of market conditions, have netted Qatar a material amount and more than what its profit share (or equity interest) would have yielded prior to the amended agreement.

9.      The proper tax treatment of AKG's payments to Qatar raises two issues: whether AKG is a partnership and whether those payments are production payments. When those questions are answered affirmatively, as they should be, the tax treatment is

clear.  AKG is a partnership for federal income tax purposes because it has the key features of a tax partnership.  And Congress has mandated that a production payment like that issued by AKG "**shall** be treated . . . as if it were a mortgage loan."  26 U.S.C. § 636(a).  And, as with a mortgage loan, a portion of the payments to Qatar are interest, which ExxonMobil is entitled to deduct.  The Commissioner's refusal to refund the tax, penalties, and interest paid by ExxonMobil following the IRS's assessments is contrary to federal law and should be remedied.

10.     In addition, the Commissioner has also made flawed determinations with respect to three other aspects of ExxonMobil's returns for tax years 2010 and 2011.  Those issues are the proper treatment of fuel blending credits, ExxonMobil's acquisition of mineral interests from Qatar through development and fiscal agreements, and ExxonMobil's acquisition of mineral interests from Malaysia through production sharing contracts.  They are asserted in this proceeding in order to address comprehensively all issues for tax years 2010 and 2011 and are described more fully below.

## PARTIES

11.     ExxonMobil is a New Jersey corporation with its global headquarters and principal place of business located at 5959 Las Colinas Boulevard, Irving, Texas 75039-2298.  ExxonMobil's Employer Identification Number is 13-5409005.

12.     Defendant is the United States of America.  Service of process may be made on Defendant by certified mail, return receipt requested, to the following:

      a.    Merrick Garland
           Attorney General for the United States
           Department of Justice
           950 Pennsylvania Ave., N.W.
           Washington, D.C. 20530-0001

   b.  Civil Process Clerk
      United States Attorney
      1100 Commerce Street
      Third Floor
      Dallas, Texas 75242-1699

   c.  Charles P. Rettig
      Commissioner
      Internal Revenue Service
      1111 Constitution Ave., N.W.
      Washington, D.C. 20224

## JURISDICTION AND VENUE

13. The Court has jurisdiction over this dispute under 28 U.S.C. § 1346(a)(1) because, for each disputed tax year, ExxonMobil (i) made full payment of the taxes, penalties, and interest assessed, as required by 28 U.S.C. § 1346(a)(1) and *Flora v. United States*, 362 U.S. 145 (1960); (ii) timely filed its Forms 843 and 1120X claims for refund, as required by 26 U.S.C. §§ 6511(a) and 7422(a); and (iii) filed this complaint within the time period prescribed in 26 U.S.C. § 6532(a).

14. Venue is proper in the Northern District of Texas under 28 U.S.C. § 1402 because ExxonMobil's principal place of business is located in this judicial district.

## STATEMENT OF FACTS

### THE CREATION AND EXPANSION OF THE AKG PARTNERSHIP

15. On May 2, 2000, Qatar and ExxonMobil entered into an agreement (the "**Agreement**") that sets forth AKG's structure.  The Agreement makes clear that ExxonMobil and Qatar intended for AKG to be a partnership, as evidenced by, among other things, their significant joint control and joint business efforts.  Pursuant to the Agreement, the parties agreed to explore and develop jointly three reservoirs in the Qatari North Field.  Following development, the joint operation would process, market, and sell the natural gas and other products produced from those reservoirs.

16.     Qatar and ExxonMobil each made substantial capital contributions to the venture.  In particular, Qatar contributed, among other things, an operating interest in three reservoirs (K1, K2, and K3) to produce up to 1,750 million standard cubic feet per day of gas.  ExxonMobil in turn contributed funds and expertise to the partnership to explore and develop the reservoirs and to build the infrastructure necessary to transport and process the gas and liquid condensate.

17.     The partners jointly manage the business and jointly market and sell the gas and liquids.  Sales have been made under the name AKG, and the business has its own logo.  Qatar and ExxonMobil each are entitled to specified shares of AKG's profits.  AKG's profits are a function of the volume of gas sold, the resulting revenues, and the costs incurred by the partnership to produce, transport, and market the gas, condensates, and other petroleum products.

18.     Following AKG's formation, certain sales contracts with other countries did not materialize.  As a result, through 2005, the partners limited AKG's production to approximately 750 million standard cubic feet per day of gas—less than half of what had been contemplated and authorized under the Agreement.

19.     Nevertheless, Qatar expected the domestic market to experience significant growth, with increasing industrial and residential need for natural gas.  By 2006, in response to the expected need for additional gas in Qatar, the partners agreed to increase AKG's production far beyond 750 million standard cubic feet of gas per day and beyond what had previously been authorized under the Agreement.

20.     Pursuant to the 2000 Agreement, AKG had explored and developed the K1, K2, and K3 reserves in the Khuff Reservoir portion of the North Field.  As part of the

June 4, 2006 amendment to the Agreement (the "**Amended Agreement**"), AKG obtained access not only to additional production from those reserves, but also to another, even richer reserve.

21.     With AKG's entitlement to additional reserves under the Amended Agreement, the parties anticipated expanding production from 750 to 2,000 million standard cubic feet per day of gas—enough gas to power more than 10 million homes daily.  As an essential part of this expansion, ExxonMobil contributed billions of dollars more to fund additional development of reserves and construction of processing facilities, while Qatar contributed additional operating interests in the existing reservoirs as well as in the new reservoir.  Based on geological and geophysical evidence, the parties expected wells in these reservoirs to be productive for decades.

22.     The new production anticipated under the Amended Agreement required AKG to build out its existing infrastructure.  That expansion included not only new wellhead platforms and gas-treating and liquids-recovery facilities, but also new equipment so that ethane—an input for plastics—could be separated out from the natural gas.  With the addition of that equipment, AKG produced three products: natural gas, liquid condensates, and ethane.

### THE PARTNERS' SHARING OF MANAGEMENT, MARKETING, PROFITS, AND LOSSES

23.     ExxonMobil and Qatar structured their venture as a partnership, in which not only profits and losses but governance and marketing responsibilities would be shared.  That structure was the product of ExxonMobil's significant interests in developing its business relationship with Qatar and ensuring that it had some control over the business in which it had made a substantial upfront capital investment.  In addition, the structure reflected Qatar's strategic interest in working hand-in-hand with

ExxonMobil so that it could develop key reservoirs for the supply of the Qatari domestic market and develop commercial relationships in the region, including with other sovereigns who could be buyers of Qatari gas and condensates.

24.     In furtherance of the partners' aims, the Amended Agreement sets forth in detail their shared rights and responsibilities with respect to the governance of AKG.  The partners agreed to maintain a Management Committee comprised of representatives from both ExxonMobil and Qatar.  That committee has extensive responsibilities for managing the partnership, including approving budgets, contracts, and development plans; overseeing the facilities' construction; and directing the gas development and processing operations.  The Management Committee meets regularly and on an ad hoc basis, and carries out its assigned responsibilities, overseeing the growth of the AKG partnership.

25.     In light of its expertise, ExxonMobil had primary responsibility for constructing the facilities and ultimate responsibility for conducting petroleum operations, subject to the Management Committee's oversight.  Qatar required that it be kept fully informed as to the progress and results of the construction of the facilities and petroleum operations and that it have full access to the facilities and all operations.

26.     In addition, the partners agreed to maintain a Joint Marketing Committee, again with representation from each of ExxonMobil and Qatar.  AKG's Joint Marketing Committee is responsible for marketing and selling the gas produced by the partnership, including negotiating sale/purchase and other agreements for the products.  The Joint Marketing Committee meets regularly and its members participate in coordinated commercial activity, including extensive negotiations regarding international supply of natural gas.

27.     The Amended Agreement makes clear that ExxonMobil and Qatar intend to share in the profits of AKG.  The agreement splits profits between the partners each quarter, depending on the quarterly revenues, costs, and volumes of gas production.

28.     The Amended Agreement also makes clear that ExxonMobil and Qatar intend to share losses, to the extent the partnership may suffer them.  For example, production costs, though advanced by ExxonMobil in the first instance, are paid out of AKG's revenues and impact the timing and amount of both partners' returns.  In addition, neither ExxonMobil nor Qatar is guaranteed the undiminished return of its capital contribution.  Thus, if the reservoirs are not as productive as expected, if ExxonMobil fails to develop the resources, if counterparties do not pay for purchased gas, if the facilities are damaged or destroyed, or if any other of myriad circumstances occur, both ExxonMobil and Qatar would incur the loss.  Indeed, AKG is in the business of selling a commodity subject to price uncertainty and fluctuation, which is an inherent risk to the partners if, for instance, markets change and the price of gas or condensates is no longer high enough to operate at a profit.

29.     In light of all of the foregoing, AKG is a partnership for federal income tax purposes.

### THE PRODUCTION PAYMENT

30.     At the time of the Amended Agreement, AKG had the opportunity to reevaluate its financing.  The parties determined that AKG would acquire additional gas volumes and redeem a substantial portion of Qatar's profit share through a production payment carved out of the entirety of the mineral interests held by the partnership.  AKG made quarterly scheduled cash payments of the production payment from revenue

generated from the production of gas, condensates, and other petroleum products. Payments were not contingent on profits or net income.

31.    By carving out a production payment, AKG recapitalized a portion of Qatar's equity interest in the venture with debt.  This financing structure was different from the prior one and carried potential advantages for Qatar because the production payment provided Qatar with a distinct form of financial interest—a transferable interest, which was prioritized in payment over its residual profit share and  could be borrowed against or sold (subject to appropriate documentation).  This structure provided Qatar with optionality that had additional value and was a source of potential liquidity.

32.    In addition, through this recapitalization, Qatar obtained an instrument that not only was different in kind from its prior profit share, but also had additional value. Specifically, the production payment included additional payments to Qatar in the event of high prices of gas and gas products, which hedged Qatar's exposure to price risk.  This component of the production payment has netted Qatar a material amount of additional dollars.

33.    The parties' decision to refinance AKG's interests in the reservoirs was an integral part of the transaction and is documented in the Amended Agreement.  As a result, AKG makes a scheduled quarterly payment to Qatar that is limited by the value of the gas produced that quarter.  The parties determined the amounts to be paid based on (i) the principal amount of the financing, (ii) a market interest rate, and (iii) a specified term of the production payment.  The terms were comparable to those that AKG could have achieved with third-party financing.  In addition, AKG was adequately capitalized,

and the production payment had a high likelihood of repayment—in other words, it had the characteristics and risk profile of debt.

34.     Production payments are common, and Congress has prescribed their proper tax treatment.  Under the Internal Revenue Code, a production payment "***shall*** be treated . . . as if it were a mortgage loan on the property," 26 U.S.C. § 636(a), permitting ExxonMobil to deduct from its income the interest component of the scheduled repayments.

35.     To constitute a production payment entitled to treatment as a mortgage loan, Treasury Regulations require only that the payment be (1) an economic interest burdening a mineral in place, (2) limited by a dollar amount, a quantum of mineral, or a period of time, and (3) with an expected economic life (at the time of its creation) of shorter duration than the economic life of the mineral properties burdened thereby.

36.     The payment here plainly meets these requirements:

- it was to be paid solely from income derived from the extraction, and was thus an economic interest burdening a mineral property,

- it was limited by both dollar amount (the principal compounded by the interest rate) and period of time, and

- its term was less than the expected economic life of the wells in the reserves.

Having satisfied these three requirements, the production payment must be treated as a mortgage loan under the Internal Revenue Code.

37.     Accordingly, as with a mortgage loan, ExxonMobil may deduct its allocated share of the interest component of the production payments.

38.     ExxonMobil has filed forms with the IRS indicating its participation in the AKG partnership since at least 2006, and it has claimed the interest deduction resulting

from the production payment since the Amended Agreement was executed in 2006.  It was not until tax years 2010 and 2011 that the IRS took issue and refused to allow the deduction.

### OTHER TAX YEAR 2010 AND 2011 ISSUES

39.     In addition, the Commissioner has also made flawed determinations with respect to three other aspects of ExxonMobil's returns for tax years 2010 and 2011.  Issues similar to those described in paragraphs 40 to 63 have been litigated for tax years 2006 to 2009 in *Exxon Mobil Corp. v. United States*, No. 3:16-CV-2921-N (N.D. Tex.), and are on appeal before the Fifth Circuit.  These issues are presented here to preserve ExxonMobil's rights with respect to tax years 2010 and 2011.

*Blending Credits*

40.     To promote energy independence and encourage the use of alternative fuels, Congress provided a tax credit for blending alcohol and biodiesel with gasoline.  One of ExxonMobil's subsidiaries earned blending credits for tax years 2010 and 2011, but the IRS incorrectly accounted for those credits in determining ExxonMobil's income tax.

41.     ExxonMobil Oil Corporation ("**EMOC**") is in the business of producing, refining, marketing, and transporting petroleum, natural gas, and petroleum products.  It is a member of the affiliated group of corporations for which ExxonMobil, as parent, files a consolidated federal income tax return.  Thus, for federal income tax purposes, ExxonMobil takes into account the income, gains, deductions, losses, and credits of EMOC on its consolidated return.

42.     Section 4081(a) imposes a federal excise tax on the removal of taxable fuel from a refinery or terminal; the entry into the United States of taxable fuel for

consumption, use, or warehousing; and certain sales of a taxable fuel.  The rate of the Section 4081 excise tax depends on the type of taxable fuel and ranges from $0.183 per gallon for non-aviation gasoline to $0.243 per gallon for diesel fuel or kerosene.

43.     Taxpayers who incur federal excise taxes must file a Form 720 quarterly and pay any excise tax not yet paid or otherwise satisfied.  Each entity liable for the Section 4081 excise tax must file its own Form 720.  Unlike federal income tax returns, a common parent of an affiliated group of corporations cannot file a single Form 720 for its affiliated group.

44.     In connection with its refining and terminal operations, EMOC incurred $2,723,243,079 of Section 4081 excise tax liability in 2010 and $2,501,504,242 of Section 4081 excise tax liability in 2011.

45.     Congress has long subsidized the blending of alcohol with gasoline.  The American Jobs Creation Act of 2004 (Pub. L. 108-357, title III, § 301(a), October 22, 2004; effective December 31, 2004) enacted Sections 6426(b) and (c), which provided an excise tax credit for blending alcohol with taxable fuel (the "**Alcohol Fuel Credit**") and for blending biodiesel with diesel fuel (the "**Biodiesel Mixture Credit**").  These blending credits replaced the prior subsidy, which reduced excise tax rates for most alcohol-blended fuels.

46.     The Alcohol Fuel Credit is equal to the number of gallons of alcohol a taxpayer blends with a taxable fuel that the taxpayer either sells or uses in its trade or business, multiplied by an applicable rate.  For tax years 2010 and 2011, the applicable rate was $0.45 per gallon for ethanol.

47.     The Biodiesel Mixture Credit is equal to the number of gallons of biodiesel a taxpayer blends in producing any biodiesel mixture that the taxpayer either sells or uses in its trade or business, multiplied by the applicable rate.  For 2011 (the only year in which EMOC had Biodiesel Mixture Credits) the applicable rate was $1.00 per gallon of biodiesel.

48.     Section 6426(a) provides that the blending credits are to be used "against the tax imposed by section 4081."  To the extent a taxpayer's blending credits exceed its Section 4081 excise tax in a given year, the taxpayer can elect to receive either a cash payment under Section 6427(e) or an income tax credit under Section 34 or Section 40.

49.     Section 9503(b)(1)(D) provides that taxes collected under Section 4081 are directed to the Highway Trust Fund.  Section 9503(b)(1) further provides that the amount of Section 4081 taxes to be received by the Highway Trust Fund must be "without reduction for credits under section 6426," including the blending credits. Section 9601 provides that the General Fund, which collects most federal taxes, shall transfer over to the Highway Trust Fund any blending credits used by a taxpayer against its Section 4081 excise tax liability.

50.     EMOC blended alcohol with the taxable fuel it produced as part of its refining and terminal operations, entitling it to an Alcohol Fuel Credit of $550,519,288 in 2010 and $517,986,373 in 2011.  EMOC blended biodiesel with diesel fuel, entitling it to a Biodiesel Mixture Credit of $308,192 in 2011.  EMOC claimed these credits on quarterly Forms 720 for those periods.

51.     For federal income tax purposes, taxable income is gross income less allowable deductions.  26 U.S.C. § 63(a).  Gross income includes proceeds from the sale

of products less the direct costs attributable to the production of those products, known as "cost of goods sold."  26 U.S.C. § 61(a)(3); Treas. Reg. § 1.61-3(a).  In the case of a seller of petroleum products, Section 4081 excise taxes form a component of the taxpayer's cost of goods sold.

52.     On its originally filed consolidated corporate income tax returns for tax years 2010 and 2011, ExxonMobil erroneously reduced cost of goods sold by the amount of the blending credits EMOC received in each year, which caused a corresponding overstatement of gross income.  The blending credits are excluded from income and should not reduce any amount that is otherwise allowable as a cost of goods sold.  Accordingly, ExxonMobil reversed this cost of goods sold reduction in its refund claims filed for tax years 2010 and 2011, resulting in a decrease in gross income of $550,519,288 for 2010 and $518,294,565 for 2011.

*Development and Fiscal Agreements*

53.     Separate and apart from the AKG partnership described above, through several development and fiscal agreements, ExxonMobil obtained the rights to extract, transport, process, liquefy, market, and sell natural gas from the North Field.  Those transactions are properly considered purchases for federal income tax purposes because Qatar derives income from sources other than extraction.  The IRS has improperly treated these transactions as mineral leases rather than purchases.

54.     ExxonMobil and the national oil company of Qatar formed several joint stock companies over several years.  These joint stock companies were formed to develop and produce offshore natural gas reserves and to construct and operate facilities necessary to transport, manufacture, market, export, and deliver liquefied natural gas to foreign

locations and buyers.  The facilities, processes, and operational and business risks involved with liquefaction are dramatically different than a flowing gas operation like AKG.  Additionally, the joint stock companies were formed to construct facilities to produce, manufacture, and market condensate and liquefied natural gas from the same gas reserves.

55.     Under certain development and fiscal agreements between ExxonMobil, the national oil company of Qatar, and Qatar, the joint stock companies purchased various rights, including the right to develop and exploit certain offshore natural gas reserves.  As a result, the joint stock companies acquired operating mineral interests in those reserves for federal income tax purposes.

56.     Under the development and fiscal agreements, among other commitments, the joint stock companies agreed to make certain contractual payments to Qatar in the future based on the value of liquefied natural gas, condensate, and liquefied petroleum gas manufactured from such natural gas.  These payments are based on the greater of a fixed amount per one million British thermal units or a variable amount determined by a formula tied to published foreign crude oil and gas prices.  The valuation point for determining the amount of the payments occurs only after substantial non-extraction activities have occurred.

57.     For federal income tax purposes, the transactions under the development and fiscal agreements, based on all the facts and circumstances, are purchases because Qatar did not retain an economic interest in the minerals in place under Treasury Regulation 1.611-1(b)(1) and controlling case law.  Qatar became entitled to, and has received, payments that are unrelated to the value of the natural gas at the point of

extraction and that reflect the significant value of petroleum products manufactured and marketed by the joint stock companies.  Therefore, these transactions are purchases, not mineral leases, and ExxonMobil properly reported its payments to Qatar as deferred purchase payments of principal and interest for tax years 2010 and 2011 under Section 483.

*Production Sharing Contracts*

58.    Pursuant to certain production sharing contracts, ExxonMobil acquired the rights to explore, develop, extract, transport, process, and sell oil and gas from Malaysia.  Those transactions are properly treated as purchases for federal tax purposes because Malaysia derived income from sources other than extraction.  The IRS has improperly treated these transactions as mineral leases rather than purchases.

59.    The Malaysian national oil and gas company (the "**MNOC**") is vested with the entire ownership in, and the exclusive rights to explore and exploit, oil and gas lying onshore or offshore in Malaysia.  The MNOC has formed a subsidiary (the "**Subsidiary**") to engage in the exploration, development, and production of oil and gas.

60.    Under certain production sharing contracts, ExxonMobil, or ExxonMobil and the Subsidiary, purchased various rights including the rights to explore, develop, produce, transport, process, store, and market oil and gas from offshore Malaysia.  As a result, ExxonMobil acquired operating mineral interests in such offshore oil and gas reserves for federal income tax purposes.

61.    Under the production sharing contracts, among other commitments, ExxonMobil agreed to make certain contractual payments to the MNOC in the future

based on the value of the petroleum after transportation, storage, processing, and marketing.

62.     Pursuant to the production sharing contracts, ExxonMobil has made investments both onshore and offshore in Malaysia, including significant investments in offshore platforms; a pumping, compression, and pipeline network; and transportation, storage, processing, and terminal facilities.  The valuation point for determining the amount of ExxonMobil's payments to the MNOC occurs only after substantial non-extraction activities associated with these petroleum operations have taken place.

63.     For federal income tax purposes, the transactions under the production sharing contracts, based on all the facts and circumstances, are purchases because the MNOC did not retain an economic interest in the minerals in place under Treasury Regulations section 1.611-1(b)(1) and controlling case law.  The MNOC became entitled to, and has received, payments that are unrelated to the value of the crude oil and natural gas at the point of extraction and that reflect the significant value of petroleum after being transported, stored, processed, and marketed by ExxonMobil.  Therefore, the transactions under the production sharing contracts are purchases, not mineral leases, and ExxonMobil properly reported its payments to the MNOC as deferred purchase payments of principal and interest under Section 483.

### THE IRS'S ERRONEOUS DECISION TO DENY
#### the DEDUCTIONS AND ASSESS INTEREST AND PENALTIES

64.     ExxonMobil timely filed a consolidated corporate income tax return for each of 2010 and 2011 with the Internal Revenue Service Center in Ogden, Utah, and has paid the total tax reported on the return for those years as follows:

| Taxable Year | Tax Paid |
|---|---|
| 2010 | $826,276,210 |
| 2011 | $416,661,461 |

65. On March 9, 2016, the IRS issued a Statutory Notice of Deficiency for 2010 and 2011, treating the Amended Agreement as a mineral lease and disregarding the partnership between ExxonMobil and Qatar and the production payment. That had the effect of dramatically increasing the tax that the IRS claimed ExxonMobil owed. The Statutory Notice of Deficiency also disregarded the blending credits earned by ExxonMobil and the proper treatment of the development and fiscal agreements and the production sharing contracts.

66. In addition, the IRS imposed accuracy-related penalties under Section 6662 for the purported underpayment of tax allegedly attributable to negligence or disregard of rules or regulations and to substantial understatements of tax—though the assessment of the penalties was not approved in writing by the immediate supervisor of the individual who made the initial penalty determination, as required by statute.

67. The proposed increases in tax and penalties were:

| Taxable Year | Tax | Penalty |
|---|---|---|
| 2010 | $448,688,875 | $48,064,633 |
| 2011 | $1,005,074,368 | $134,403,150 |

68. ExxonMobil had properly reported the tax consequences of the AKG production payment, as well as the blending credits, development and fiscal agreements, and production sharing contracts, and therefore no tax is owed in respect of these transactions and no underpayment to which a penalty applies occurred.[1]

---

[1] ExxonMobil does not seek a refund of income tax or penalty owed for tax year 2010 or 2011 to the extent attributable to production payments made during those years under the 2008 production sharing contract, except to the extent that the IRS imposed a penalty related to such payments without the requisite supervisory approval. ExxonMobil reserves the right to seek a refund of income tax and penalty owed for

69.     Moreover, no underpayment penalty was appropriate.  There was substantial authority for the tax treatment of the transactions as reported on ExxonMobil's tax returns for 2010 and 2011.  The positions taken on those returns had a reasonable basis, and ExxonMobil adequately disclosed the transactions on the returns.  ExxonMobil did not disregard any rule or regulation when reporting the transactions, including because the positions taken in the returns had a realistic possibility of being sustained on the merits.[2]

70.     On April 15, 2016, ExxonMobil submitted Form 4089-B, *Notice of Deficiency—Waiver*, consenting to the immediate assessment and collection of the tax, penalties, and interest and instructed the IRS to pay the tax, penalties, and interest by applying amounts on deposit with the IRS.

71.     On May 16, 2016, the IRS assessed the tax, penalties, and interest for 2010 and 2011.  On May 23, 2016, the IRS assessed additional tax and interest for the 2011 tax year.  The assessed interest wrongly included (i) interest accrued for 2010 and 2011 when ExxonMobil elected to apply the overpayments shown on its tax returns to its estimated tax for the succeeding tax year; (ii) interest accrued for the 2010 tax year from the date when ExxonMobil remitted tax deposits to the IRS through the date when ExxonMobil designated the deposits as payments of tax; and (iii) interest on the 2011 penalty before the extended due date of the 2011 return, which had been extended to September 17, 2012.

---

later tax years to the extent attributable to production payments made during such later years under the 2008 production sharing contract.

[2] *See supra* note 1.

72.     Following the IRS's assessment of taxes, penalties, and interest, ExxonMobil timely filed Amended U.S. Corporation Income Tax Returns for tax years 2010 and 2011 (as well as later timely supplements to those refund claims), seeking refunds of its tax payments.

73.     ExxonMobil timely filed Forms 843, *Claim for Refund and Request for Abatement*, for both tax years 2010 and 2011 (as well as later timely supplements to those refund claims), which requested a refund of all assessed penalties and interest paid by ExxonMobil.  In addition, the Forms 843 requested interest netting, identified the underpayment and overpayment balances to be used in the netting computations, and reserved the right to later assert different overlapping periods.  The IRS has not refunded any penalties and has not refunded all interest requested or applied a net interest rate of zero for those periods with overlapping balances, as it is required to do.

74.     Pursuant to its refund claims, ExxonMobil requested a refund of the following tax, penalties, and interest for tax years 2010 and 2011:

| Taxable Year | Tax | Penalty | Interest |
|---|---|---|---|
| 2010 | $855,935,648 | $48,064,633 | $25,807,317 |
| 2011 | $986,516,153 | $134,403,150 | $16,388,288 |

75.     In 2020, the IRS abated tax and underpayment interest for the 2010 and 2011 tax years and issued refunds of tax with overpayment interest as follows:

| Taxable Year | Tax | Underpayment Interest | Overpayment Interest | Refunds |
|---|---|---|---|---|
| 2010 | $66,290,188 | $4,284,334 | $6,722,767 | $77,297,289 |
| 2011 | $105,496,115 | $2,992,148 | $10,438,982 | $118,927,245 |

The IRS and ExxonMobil have also agreed on issues and adjustments unrelated to the issues raised in this Complaint, and an abatement and refund is currently pending.  This abatement and refund will be taken into account as part of the computational and

correlative adjustments when determining ExxonMobil's recovery from the below causes of action if not previously made or received.

## FIRST CAUSE OF ACTION
## OVERPAYMENT OF INCOME TAX – AKG PRODUCTION PAYMENT

76.     ExxonMobil incorporates by reference the allegations contained in the foregoing paragraphs.

77.     ExxonMobil and Qatar formed AKG for the purpose of exploring, developing, extracting, processing, marketing, and selling natural gas, condensates, and other petroleum products.  The parties intended to be partners in that venture, jointly managing the business and marketing the produced gas, and sharing in its profits and losses.  In light of ExxonMobil and Qatar's joint efforts, AKG is properly treated as a tax partnership.

78.     In the Amended Agreement between ExxonMobil and Qatar, the parties recapitalized the partnership by redeeming Qatar's existing equity share with debt, carving out a production payment from the gas interests held by AKG.  Per the Amended Agreement, the production payment was an economic interest held by Qatar that burdened the AKG reserves, and was issued by AKG to pay down the principal amount and interest over a term that was less than the anticipated economic life of the reserves. Under federal law, this production payment "shall be treated . . . as if it were a mortgage loan on the property."  26 U.S.C. § 636(a).

79.     The Commissioner erroneously determined that the Amended Agreement was a mineral lease, entirely disregarding the AKG tax partnership and refusing to recognize that AKG's production payment to Qatar must be treated as debt for federal income tax purposes.  The interest on that debt is deductible, and the Commissioner has

refused to allow that deduction.  The Commissioner has therefore wrongly failed to allow ExxonMobil's claims for a refund of income tax paid for tax years 2010 and 2011.

80.     In the alternative, the Commissioner erroneously failed to allow ExxonMobil's claims for a refund of income tax paid for tax years 2010 and 2011 because the AKG production payment in substance is debt under common law principles or other applicable law.  Under this alternative, the payments to Qatar would be treated for tax purposes as payments of principal and interest on debt secured by the burdened properties.

81.     In the alternative, the Commissioner erroneously failed to allow ExxonMobil's claims for a refund of income tax paid for tax years 2010 and 2011 because AKG (or ExxonMobil, if the AKG partnership is not respected for tax purposes) should be treated as purchasing property in exchange for a series of future contingent payments subject to Section 483.  Under this alternative, the payments to Qatar would be properly characterized as payments of principal and interest under Section 483.

82.     ExxonMobil seeks recovery of the overpayment of federal income taxes for tax years 2010 and 2011 attributable to this claim and related computational and correlative adjustments, taking into account any additional carrybacks, carryovers, or other items that may be applied to tax years 2010 and 2011.

### SECOND CAUSE OF ACTION
### OVERPAYMENT OF INCOME TAX – BLENDING CREDITS

83.     ExxonMobil incorporates by reference the allegations contained in the foregoing paragraphs.

84.     The Commissioner erroneously disallowed ExxonMobil's claims for a refund of income tax paid for tax years 2010 and 2011 because he erroneously determined that the blending credits are included in gross income.

85.     ExxonMobil seeks recovery of the overpayment of federal income taxes for tax years 2010 and 2011 attributable to this claim and related computational and correlative adjustments, taking into account any additional carrybacks, carryovers, or other items that may be applied to tax years 2010 and 2011.

**THIRD CAUSE OF ACTION**
**OVERPAYMENT OF INCOME TAX – DEVELOPMENT AND FISCAL**
**AGREEMENTS**

86.     ExxonMobil incorporates by reference the allegations contained in the foregoing paragraphs.

87.     The Commissioner erroneously failed to allow ExxonMobil's claims for a refund of income tax paid for tax years 2010 and 2011 because he erroneously determined that the development and fiscal agreements with Qatar are mineral leases and not purchases for federal income tax purposes.

88.     Alternatively, ExxonMobil purchased intangible property under Section 197.

89.     ExxonMobil seeks recovery of the overpayment of federal income taxes for tax years 2010 and 2011 attributable to this claim and related computational and correlative adjustments, taking into account any additional carrybacks, carryovers, or other items that may be applied to tax years 2010 and 2011.

**FOURTH CAUSE OF ACTION**
**OVERPAYMENT OF INCOME TAX – PRODUCTION SHARING CONTRACTS**

90.     ExxonMobil incorporates by reference the allegations contained in the foregoing paragraphs.

91.     The Commissioner erroneously failed to allow ExxonMobil's claims for a refund of income tax paid for the Disputed Tax Years because he erroneously determined that the transactions under the production sharing contracts are mineral leases and not purchases for federal income tax purposes.

92.     Alternatively, ExxonMobil purchased intangible property under Section 197.

93.     ExxonMobil seeks recovery of the overpayment of federal income taxes for tax years 2010 and 2011 attributable to this claim and related computational and correlative adjustments, taking into account any additional carrybacks, carryovers, or other items that may be applied to tax years 2010 and 2011.

**FIFTH CAUSE OF ACTION**
**SECTION 6662 PENALTIES**

94.     ExxonMobil incorporates by reference the allegations contained in the foregoing paragraphs.

95.     The Commissioner erroneously failed to allow ExxonMobil's claims for refund of the penalties because ExxonMobil properly reported the tax consequences of the production payment, development and fiscal agreements, and production sharing contracts so there was no underpayment of tax in respect of these transactions.[3]

---

[3] *See supra* note 1.

96.     Even if there had been an underpayment of tax, no underpayment penalty would have been appropriate.  There was substantial authority for the tax treatment of the transactions as reported on ExxonMobil's tax returns for 2010 and 2011.  The positions taken on those returns had a reasonable basis, and ExxonMobil adequately disclosed the transactions on the returns.  ExxonMobil also did not disregard any rule or regulation in reporting the transactions.  Moreover, the immediate supervisor of the individual who made the initial determination of the assessment of the penalties failed to personally approve such initial determination in writing, as required by statute.  Thus, even if there had been an underpayment of tax, the Commissioner's determination not to refund the penalties would still have been erroneous and improper.

97.     ExxonMobil seeks recovery of the penalties paid for tax years 2010 and 2011.

### SIXTH CAUSE OF ACTION
### UNDERPAYMENT INTEREST

98.     ExxonMobil incorporates by reference the allegations contained in the foregoing paragraphs.

99.     The Commissioner erroneously failed to allow ExxonMobil's claims for refund of underpayment interest to the extent that ExxonMobil did not underpay its tax.

100.     In the alternative, if ExxonMobil did underpay any of its tax, the Commissioner erroneously failed to allow ExxonMobil's claims for refund of interest because (i) interest should have been suspended in an amount and period of time to reflect ExxonMobil's election to apply the overpayments shown on its returns to its estimated tax for the succeeding tax year; (ii) interest should have been suspended from the date when ExxonMobil remitted tax deposits to the IRS through the date when

ExxonMobil designated the deposits as payments of tax, including payments that the IRS later erroneously treated as deposits; (iii) interest should not have been imposed on the 2011 penalty before the extended due date of the return; and (iv) the correct amount of any underpayment interest should have been computed using a net interest rate of zero for periods with overlapping underpayment or overpayment balances.

101.    ExxonMobil seeks recovery of the underpayment interest illegally assessed and collected for tax years 2010 and 2011 and any related interest erroneously accrued thereon and collected from ExxonMobil.

## PRAYER FOR RELIEF

WHEREFORE, ExxonMobil respectfully requests that the Court:

a.    Award ExxonMobil the overpayments of taxes, penalties, and interest for tax years 2010 and 2011 in the amounts set forth above, or such other amount as is legally refundable, plus statutory interest as provided by law; and

b.    Award ExxonMobil all other relief to which it is entitled.

Dated:   Dallas, Texas
March 4, 2022

DAVIS POLK & WARDWELL LLP

By:   */s/ James P. Rouhandeh*

James P. Rouhandeh*
james.rouhandeh@davispolk.com
Antonio J. Perez-Marques*
antonio.perez@davispolk.com
Lara Samet Buchwald*
lara.buchwald@davispolk.com
Andrew S. Gehring*
andrew.gehring@davispolk.com
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
*pro hac vice* applications forthcoming


HOLLAND & KNIGHT LLP

By:   */s/ Mary A. McNulty*

Emily A. Parker
State Bar No. 15482500
emily.parker@hklaw.com
Mary A. McNulty
State Bar No. 13839680
mary.mcnulty@hklaw.com
Leonora S. Meyercord
State Bar No. 24074711
lee.meyercord@hklaw.com
J. Meghan McCaig
State Bar No. 24070083
meghan.mccaig@hklaw.com
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 964-9501 (Fax)

*Attorneys for Plaintiff*
*Exxon Mobil Corporation*