## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

EXXON MOBIL CORPORATION,

                  Plaintiff,

    - against -

UNITED STATES OF AMERICA,

                  Defendant.

CIVIL ACTION NO. 3:22-CV-00515-N

### JOINT PRETRIAL ORDER

This Joint Pretrial Order is respectfully submitted by Plaintiff Exxon Mobil Corporation and Defendant United States of America pursuant to Local Rule 16.4.

## I.  Summary of Each Party's Claims and Defenses

### A.  Summary of ExxonMobil's Claims[1]

Exxon Mobil Corporation is the common parent of an affiliated group of corporations (collectively, "ExxonMobil") as defined in Section 1504 of the Internal Revenue Code (the "Tax Code").  ExxonMobil seeks a refund of taxes, penalties, and interest wrongfully collected by the Internal Revenue Service ("IRS") for tax years 2010 and 2011 in connection with production payments made by Al Khaleej Gas, a partnership between ExxonMobil and the State of Qatar, to the State of Qatar.  Under the Tax Code, ExxonMobil is entitled to deduct interest expense paid on the production payments.  The IRS erroneously disallowed those deductions.

In 2000, ExxonMobil, through its affiliate Exxon Mobil Middle East Gas Marketing Limited ("EMMEGML"), and the State of Qatar came together to form a joint business venture,

---

[1] To the extent not otherwise expressly set forth herein, ExxonMobil incorporates by reference all the allegations in the Amended Complaint.  (ECF 45.)

Al Khaleej Gas, to develop and market natural gas and gas products from the North Field, one of the largest gas fields in the world. Through Al Khaleej Gas, ExxonMobil and the State of Qatar have jointly produced, marketed, and sold hundreds of millions of cubic feet of gas per day—enough gas to power millions of homes each year—and shared annual revenues in the billions of dollars.

In 2006, ExxonMobil and the State of Qatar amended the terms of their partnership to significantly expand production to meet growing local demand for power.[2] In furtherance of that commercial objective, the partners contributed new mineral rights, invested new cash, built new infrastructure, and updated the terms of their agreement. Among those changes, the partners recapitalized the State of Qatar's equity interest in Al Khaleej Gas. Instead of receiving solely a profit share, the State of Qatar received two different interests in the parties' amended agreement: a production payment (constituting debt) and a reduced equity interest.

The "key question" in this case is whether ExxonMobil can deduct interest expense paid on the production payments.[3] (Bifurcation Order (ECF 50) at 2.) "To answer that question, the Court must determine whether AKG is a valid partnership under federal law and whether the transactions in question are production payments for federal tax purposes." (*Id.*; *see also* Am. Compl. (ECF 45) ¶ 9.) The answer to both questions is yes. In addition, even if the production payment did not qualify as a carved-out production payment that is treated "*as if it were*" debt

---

[2] The partners' original agreement in 2000 is called the Development and Production Sharing Agreement, or "DPSA." The partners' amended agreement in 2006 is called the Amended Development and Production Sharing Agreement, or "ARDPSA."

[3] The Court bifurcated from trial the computation of the refund amount owed to ExxonMobil and "the validity of the penalties ExxonMobil incurred for underpayment of taxes." (ECF 50 at 3.) The Court ordered that those issues would be scheduled for trial upon resolution of "ExxonMobil's entitlement to a deduction for production payments." (*Id.*) The parties agreed that the computational issues bifurcated pursuant to the Court's order include the proper accrual of underpayment interest and accordingly that issue is not addressed herein.

for federal tax purposes, the production payment *is* debt under common law principles. ExxonMobil's interest expense deductions were lawful for that additional reason.

<strong>i.  Al Khaleej Gas Is a Partnership Under Federal Tax Law</strong>

Under federal tax law, a partnership exists where two or more parties "intend[] to join together for the purpose of carrying on business and sharing in the profits or losses or both." *Comm'r v. Culbertson*, 337 U.S. 733, 741 (1949) (quoting *Comm'r v. Tower*, 327 U.S. 280, 287 (1946)).[4] That test is easily met here.

*First*, ExxonMobil and the State of Qatar carried on a joint business. Both parties made significant contributions to Al Khaleej Gas: the State of Qatar contributed valuable mineral rights, and ExxonMobil contributed billions of dollars of cash to construct the infrastructure needed to develop the minerals, including offshore wells, platforms, pipelines, and extensive onshore facilities. Each party also contributed intellectual capital and know-how in connection with jointly managing the business and jointly marketing and selling its products. The degree of joint activity between the parties was unique and significant, and both partners played an active role in the management and operation of the business. For example:

- the partners jointly managed the business, including through a Management Committee that had equal representation from both partners, had expansive authority, met regularly, and made all decisions unanimously;

- the partners jointly marketed the gas and gas products produced by the partnership, including through a Joint Marketing Committee that also had equal representation from both partners, met regularly, and made all decisions unanimously;

- the partners jointly sold the gas and gas products produced by the partnership through sales agreements with buyers;

---

[4] The Tax Code and the Treasury Regulations, while articulating the standard in slightly different terms, effectively require the same two elements: a joint business undertaking and the sharing of profits therefrom. *See* 26 U.S.C. § 761(a); Treas. Reg. § 301.7701-1(a)(2).

- the partners created other committees with joint representation to guide a complex business with significant infrastructure and production demands; and

- the partners developed a trade name ("Al Khaleej Gas," meaning "Gulf Gas" in Arabic), a distinct logo, and slogans (e.g., "Partners in Providing Power to the Nation") to increase the partnership's profile, thereby giving their partnership a distinct identity different from that of either partner acting alone.

*Second*, the business was profitable, and ExxonMobil and the State of Qatar both shared in those profits.  Although not required to establish a partnership under federal tax law, the partners also shared in the risk of loss, both at the outset of the partnership and through its operation.  For example, ExxonMobil put at risk the cash that it invested, and the State of Qatar put at risk, among other things, the valuable mineral rights that it contributed.  The State of Qatar also indirectly shared in the costs and expenses of the partnership, receiving profits from production only after ExxonMobil recovers its costs.  As a result, Al Khaleej Gas is a partnership under federal tax law.  Because Al Khaleej Gas is a partnership, the ARDPSA is not a mineral lease.  Indeed, a mineral lease would have none of the features—including joint management, joint marketing, joint sales, the use of a trade name and logo, and more—described above.

### ii.    The Al Khaleej Gas Production Payment Is a Carved-Out Production Payment Under Federal Law

The Al Khaleej Gas production payment satisfies all of the criteria under the Tax Code and the Treasury Regulations for a carved-out production payment, which as a matter of law must ("shall") be treated as debt for federal tax purposes.  *See* 26 U.S.C. § 636(a); Treas. Reg. § 1.636-3.

There are three requirements for a production payment under Section 636(a).  The payment must be: (i) an economic interest that burdens mineral property; (ii) limited by dollar amount, volume, or period of time; and (iii) expected, at the time of its creation, to have an

4

economic life that is shorter than the life of the minerals that it burdens.  Treas. Reg. § 1.636-3(a)(1).  All three requirements are satisfied here:

- the production payment is an economic interest that burdens mineral property because it was paid solely from income derived from the extraction of minerals;

- the production payment is limited by both dollar amount (a contractually agreed amount of principal and interest) *and* time (the payments end in 2027); and

- the term of the production payment is shorter than the expected life of the reservoirs in the North Field (the world's largest non-associated gas field), and shorter than the mineral rights held by the Al Khaleej Gas partnership that it burdens (which extend until at least 2030).

Because the production payment was "carved out of mineral property"—specifically, the Al Khaleej Gas partnership's interest in the North Field mineral rights contributed by the State of Qatar—Congress has mandated that it "*shall* be treated . . . as if it were a mortgage loan on the property."  26 U.S.C. § 636(a) (emphasis added).  As with a mortgage loan (i.e., debt), ExxonMobil is entitled to deduct interest expense paid on the production payments.

### iii. In Addition to Being Treated *as* Debt Under the Tax Code, the Production Payment *Is* Debt Under Common Law Principles

Because the Al Khaleej Gas production payment meets the requirements for a production payment under Section 636(a) of the Tax Code, Congress has mandated that it "*shall* be treated . . . as if it were" debt for tax purposes.  26 U.S.C. § 636(a) (emphasis added).  That alone is sufficient to show that ExxonMobil is entitled to the interest expense deductions at issue here.  However, even if the production payment did not meet the Tax Code's requirements for treatment "*as if it were*" debt, *id.* (emphasis added), the production payment *is* debt under applicable common law principles.  ExxonMobil's interest expense deductions were lawful for this separate and independent reason.

The Fifth Circuit has set forth thirteen factors that "merit consideration" in determining whether an instrument is debt or equity for tax purposes.  *See Estate of Mixon v. United States*,

464 F.2d 394, 402 (5th Cir. 1972). Those factors include the name of the instrument (including whether it includes a stated principal amount, market interest rate, maturity date, and fixed payment schedule), whether there is a fixed maturity date, whether the issuer is adequately capitalized, and whether the payments are dependent on the issuer's profits. *Id.*

When applied here, the Fifth Circuit's factors show that the production payment is debt. For example, the production payment has the objective indicia of debt: it has a fixed principal amount, an agreed-upon market rate of interest, a fixed schedule of quarterly payments, and a fixed maturity date in 2027. In addition, the production payment displays the economic characteristics of debt, including, among other things, (i) the likelihood that the production payment would be repaid in full was high; (ii) Al Khaleej Gas had sufficient capital to support payments of principal and interest; and (iii) the production payment has similar economic features compared to other debt instruments that were issued in debt capital markets in the period leading up to the execution of the ARDPSA. Moreover, the economic outcomes of the production payment have almost no correlation with the outcomes of the Al Khaleej Gas partnership as a whole; it does not share in the upside of the business. Those features all demonstrate that the production payment is debt for tax purposes. *See, e.g.*, *Slappey Drive Indus. Park v. United States*, 561 F.2d 572, 581 (5th Cir. 1977) ("Generally, shareholders place their money 'at the risk of the business' while lenders seek a more reliable return.").

### B.    Summary of United States' Defenses

In this *de novo* tax refund suit, ExxonMobil has the burden of proving that it overpaid its federal income taxes. *See Trinity Indus., Inc. v. United States*, 757 F.3d 400, 413 (5th Cir. 2014).

In its original Complaint, ExxonMobil sought a tax refund related to two issues addressed in a prior case before this Court: the tax treatment of "Blending Credits" and the proper treatment

6

(sale vs. lease) of DFA agreements in Qatar and PSC agreements in Malaysia.  Compl. ¶¶ 83–93 Cause of Actions Two – Four, Mar. 3, 2022, ECF No. 1.

      In its Amended Complaint, ExxonMobil has now withdrawn those claims because of the Fifth Circuit's affirmance of this Court's rejection of identical claims in the prior case, for prior tax years.  *Exxon Mobil Corp. v. United States*, 43 F.4th 424 (5th Cir. 2022); *see also* Am. Compl, July 14, 2023, ECF No. 45.  The remaining tax refund claim in ExxonMobil's Amended Complaint is based on a new argument regarding another agreement that it has with the State of Qatar for gas production—the Amended and Restated Development and Production Sharing Agreement ("ARDPSA"). ExxonMobil contends that this agreement contains a "production payment" that should be treated as debt pursuant to 26 U.S.C. § 636(a) and that that agreement created a "partnership" that engaged in certain alleged transactions with Qatar, which allegedly creates other tax items that should be recognized.  *See* Am. Compl. ¶¶ 65–70 Cause of Action One.  ExxonMobil's Amended Complaint also seeks a refund of penalties and overpayment interest, but those claims have been bifurcated and will be addressed later.  Am. Compl. ¶¶ 71–78 Cause of Action Two and Three; Order Granting ExxonMobil's Mot. to Bifurcate, Sept. 6, 2023, ECF No. 50.

      The United States has filed a motion for partial summary judgment on ExxonMobil's remaining tax refund claim because the terms of the ARDPSA are not disputed and ExxonMobil's new theory fails as a matter of law.  The ARDPSA is a lease with production sharing. Once again, ExxonMobil's roll of the dice with a contrary novel tax theory is "irreconcilable with decades of cases . . . ."  *Exxon Mobil Corp.*, 43 F.4th at 433.  A trial will demonstrate that the undisputed facts compel rejection of ExxonMobil's latest effort to

recharacterize another one of its oil and gas leases, in its continuing quest to use excess foreign tax credits.

ExxonMobil's latest theory is based on its addition of Appendix G to the 2006 ARDPSA—an appendix admittedly tacked on solely for ExxonMobil's intended tax manipulations.  ExxonMobil hoped that this attempted recharacterization—on paper, for tax purposes only—could reduce its taxes.  But the substantive fiscal terms of the ARDPSA were not materially changed for either party.  As one of ExxonMobil's employees acknowledged,

> [Qatar] like[s] the idea of a tax mechanism that enables them to effectively have their marginal projects [with ExxonMobil] subsidized by the US IRS.

ExxonMobil's "production payment" tax theory fails because the ARDPSA is, as was the original Development and Production Sharing Agreement ("DPSA") before it, a lease, and Qatar's entitlement to a share of profit petroleum from the AKG project is a royalty.  The so-called "production payment" provisions in Appendix G are mere paper descriptions that have no substantive effect on Qatar's royalty entitlements.  Appendix G is window dressing, for U.S. tax purposes only, to relabel part of Qatar's royalty share into "loan" payments under § 636(a), a portion of which ExxonMobil would seek to treat as deductible interest expense.  Based on this alchemy, ExxonMobil invents a purported reduction in U.S. income tax of nearly $275 million for 2010 and 2011 when nothing of substance changed.

There are at least four reasons why the Court should deny ExxonMobil's refund claim.

First, the ARDPSA is in substance a lease and Qatar's share of profit petroleum should be treated as a lease royalty.  Qatar's share is defined by percentages of production in Article 19.8.1 of the ARDPSA, as in a typical production-sharing agreement treated as a lease with a royalty.  *See Exxon Mobil Corp. v. United States*, 43 F.4th 424 (5th Cir. 2022).  Following the principles that decided the previous case, Qatar's Article 19.8.1 entitlement to a portion of mineral

8

production is a lease royalty and the new labels in Appendix G cannot change that substance. *See* Findings of Fact and Conclusions of Law 5, 14 ("Sale/Lease Decision"); *Exxon Mobil Corp. v. United States* ("Exxon I"), Civil Action No. 3:16-CV-2921-N, Feb. 24, 2020, ECF No. 276.

Second, the "production payment" described in Appendix G does not, in any event, meet the basic requirements of a qualified production payment under § 636(a), which must be materially "limited" in "dollar amount, a quantum of mineral, or a period of time." Treas. Reg. § 1.636-3(a); *Brountas v. Comm'r*, 692 F.2d 152, 158 (1st Cir. 1982). The term of a qualified payment also must be shorter than the mineral interest (here, under ExxonMobil's theory, the ARDPSA) out of which it is allegedly carved. Treas. Reg. § 1.636-3(a). Qatar's royalty share of profit petroleum is not limited by Appendix G or any "Production Payment" and "Residual Profit Share" labeling. The attempt to describe it as limited is illusion, and Qatar is entitled to the same share it would receive under Article 19 of the ARDPSA regardless of Appendix G's artifice. Indeed, as ARDPSA Article 19.8.2 states:

> [Qatar] shall never receive less in payments by application of Appendix G than the total revenues and at the times allocated to it under Article 19.8.1.

Gov't Ex. 1. Given this assurance and the fact that Qatar does not pay U.S. income tax, Qatar had little reason to be concerned about the byzantine language of Appendix G inserted solely for ExxonMobil's "tax optimization" efforts.

Third, the ARDPSA is no form of debt. It is a lease, just like the other agreements at issue in *Exxon I* were leases. *Exxon Mobil Corp.*, 43 F.4th at 434 ("That means the agreements are as Exxon originally described them: leases."). While ExxonMobil alludes to an alternative debt theory in its Amended Complaint, as a last resort, that alternative is fatally undermined by the undisputed fact that there is no biding obligation to pay anything to Qatar. Qatar is entitled to its share only if there is production, as is typical in a gas lease. Indeed, ExxonMobil's debt

9

hypothesis contradicts its production payment theory since a payment eligible to be treated as production payment is not debt in the first place; it is just sometimes treated as debt for tax purposes under § 636 if its requirements are met.

Finally, to support its production payment theory, ExxonMobil also alleges a series of other complicated transactions between ExxonMobil and Qatar and an alleged partnership that it contends should be deemed to exist for tax purposes. But *no* evidence of these complicated transactions exists and there is no partnership and no entity eligible to be a partnership. Treas. Reg. § 301.7701-1(a). ExxonMobil cannot present even prima facie evidence that the imaginary partnership transactions have any substance. And ExxonMobil's allegation that Qatar "sold" $7 billion of production rights is contradicted by ExxonMobil's admission that Qatar has retained an economic interest in the minerals. These failures and contradictions doom its production payment scheme because the nonexistent partnership transactions are necessary (but not sufficient) for ExxonMobil's origin story (the imagined "recapitalization") for a production payment.

But the Court need not untangle all these alleged partnership transactions if it determines that the ARDPSA is what it is – a lease – or determines that the requirements of § 636(a) and Treas. Reg. § 1.636-3 are not met in any event. If ExxonMobil could surmount those threshold obstacles, ExxonMobil would also then have to prove these additional alleged partnership contentions as well and prove the contrived value of the hypothesized transactions to support its theory. But finding that the ARDPSA is a lease or that § 636 does not apply would render additional issues moot. ExxonMobil's tax claims fail because they have no substance. Putting aside ExxonMobil's attempted tax manipulations, the ARDPSA is a lease with production sharing. Because ExxonMobil cannot establish its claim for a $300-million-plus tax

refund (with interest) based on an unprecedented transmogrification of a run-of-the-mill gas lease and royalty, the Court can grant partial summary judgment or rule against ExxonMobil's tax refund claims for 2010 and 2011 after trial.

## II.   Statement of Stipulated Facts

1.      ExxonMobil is a New Jersey corporation with its global headquarters and principal place of business located at 22777 Springwoods Village Parkway in Spring, Texas.  At the time the lawsuit was filed, ExxonMobil's principal place of business was 5959 Las Colinas Boulevard in Irving, Texas.

2.      On May 2, 2000, ExxonMobil Middle East Gas Marketing Limited, a subsidiary of ExxonMobil, and the Government of the State of Qatar entered into the Development and Production Sharing Agreement for EGU Contract Reservoirs in the EGU Contract Location, North Field (the "DPSA").

3.      On June 4, 2006, ExxonMobil Middle East Gas Marketing Limited and the Government of the State of Qatar entered into the Amended and Restated Development and Production Sharing Agreement for Al Khaleej Gas (the "ARDPSA").

4.      ExxonMobil timely filed a consolidated corporate income tax return for 2010 and 2011 with the IRS Service Center in Ogden, Utah and its Employer Identification Number is 13-5409005.

5.      On March 4, 2022, ExxonMobil timely filed this action.

6.      On July 14, 2023, ExxonMobil filed an Amended Complaint (ECF 45), which became the operative complaint this action.

7.      The parties stipulate that the following Joint Exhibits are admissible and will be admitted as joint exhibits at trial:[5]

(1)      Joint Exhibit 1 is the Development and Production Sharing Agreement between the Government of the State of Qatar and ExxonMobil Middle East Gas Marketing Limited, dated May 2, 2000 (EM_10-11_0691451); and

(2)      Joint Exhibit 2 is the Amended and Restated Development and Production Sharing Agreement between the Government of the State of Qatar and ExxonMobil Middle East Gas Marketing Limited, dated June 4, 2006 (EM_10-11_0687732).

## III.   Contested Issues of Fact

### A.   ExxonMobil's Contested Issues of Fact

ExxonMobil submits these contested issues of fact without conceding any particular issue must be proven in order for ExxonMobil to prevail on its claims.  To the extent that the Court deems any of the contested issues of fact to be issues of law or mixed issues of fact and law, ExxonMobil submits them as such.  ExxonMobil's position, as set forth in its Memorandum of Law in Support of its Motion for Summary Judgment (ECF 73), is that there is no genuine dispute of fact that bears on the two questions before the Court—whether Al Khaleej Gas is a partnership under federal tax law, and whether the payments to the State of Qatar are production payments for federal tax purposes—and that ExxonMobil is entitled to summary judgment in its favor.  ExxonMobil submits these contested issues without prejudice to that position.

1.      Whether ExxonMobil and the State of Qatar jointly managed Al Khaleej Gas.

2.      Whether ExxonMobil and the State of Qatar jointly marketed the gas and gas products produced by Al Khaleej Gas.

---

[5] Some of these exhibits may be subject to a post-trial application from ExxonMobil to maintain the documents under seal because they are confidential and proprietary and should not be publicly disclosed.  Defendant reserves all rights with respect to any such application.

3.      Whether ExxonMobil and the State of Qatar jointly sold the gas and gas products produced by Al Khaleej Gas.

4.      Whether ExxonMobil and the State of Qatar developed and used a trade name, logo, and slogans for Al Khaleej Gas.

5.      Whether ExxonMobil and the State of Qatar held themselves out as partners with respect to Al Khaleej Gas.

6.      Whether ExxonMobil and the State of Qatar maintained a joint bank account for Al Khaleej Gas.

7.      Whether ExxonMobil and the State of Qatar shared in the profits of Al Khaleej Gas.

8.      Whether ExxonMobil and the State of Qatar shared in the costs and expenses of Al Khaleej Gas.

9.      Whether ExxonMobil and the State of Qatar shared in the risk of loss of Al Khaleej Gas.

10.      Whether Al Khaleej Gas bears the economic characteristics of a partnership.

11.      Whether the State of Qatar contributed mineral rights to the Al Khaleej Gas partnership.

12.      Whether ExxonMobil and the State of Qatar held partnership interests in Al Khaleej Gas and not an interest in the underlying mineral rights contributed by the State of Qatar.

13.      Whether, as a result of the ARDPSA, the State of Qatar held two different interests under the ARDPSA: an equity interest, and a production payment that was different than the equity interest in form and value.

14.     Whether the production payment was payable solely from the production of minerals.

15.     Whether the term of the production payment is shorter than the term of the mineral rights granted by the State of Qatar to the Al Khaleej Gas partnership in the ARDPSA.

16.     Whether the term of the production payment is shorter than the expected economic life of the reservoirs in the ARDPSA.

17.     Whether the production payment is limited in dollar amount and/or time.

18.     Whether the production payment was carved out of the mineral rights contributed by the State of Qatar to the Al Khaleej Gas partnership.

19.     Whether the production payment is separately transferrable from the State of Qatar's Residual Profit Share.

20.     Whether the Al Khaleej Gas partnership was adequately capitalized.

21.     Whether the production payment bears objective indicia of debt, including a stated principal amount, market interest rate, payment schedule, and maturity date.

22.     Whether the production payment has the economic characteristics of debt.

23.     Whether the Al Khaleej Gas partnership was obligated to, and in fact did, make payments to the State of Qatar pursuant to Appendix G of the ARDPSA.

24.     Whether the production payment was paid even in quarters in which the Al Khaleej Gas partnership had no profits.

### B.     United States' Contested Issues of Fact

The United States has filed a motion for partial summary judgment.  *See* ECF Nos. 69-71. Because summary judgment against ExxonMobil is appropriate, the United States does not believe that there are any *material* facts in dispute.  Any disputed facts are not necessary to reject ExxonMobil's claim.

But if the parties proceed to a trial, the following may be considered contested issues of fact:[6]

1.      Whether a "partnership" entity exists and was created for U.S. tax purposes, between the sovereign host country State of Qatar and the "Contractor" ExxonMobil in connection with the DPSA and/or the ARDPSA.

2.      Whether any of the "partnership" transactions and "recapitalization" that ExxonMobil alleges actually occurred and the value of any actual or deemed transactions, including an alleged "sale" of mineral rights to a purported partnership.

3.      Whether any property or mineral or production rights were conveyed or contributed under the ARDPSA as alleged by ExxonMobil and their value, including:

      a.      The basis for valuing the "principal" of the alleged production payment at $10,782,157,235, which would require proving the value of any consideration exchanged for a production payment;

      b.      The mineral "property" that Qatar allegedly conveyed or "contributed" at the signing of the DPSA, which granted ExxonMobil rights to develop and exploit up to 1,750 MMSCFD from the AKG reservoirs; and

      c.      The mineral "property" that Qatar allegedly conveyed or "contributed" at the signing of the ARDPSA, which  granted ExxonMobil rights to develop and exploit up to an additional 250 MMSCFD (2,000 MMSCFD total) from the AKG reservoirs.

4.      ExxonMobil's substantiation of Qatar's entitlements under the ARDPSA, of any alleged payments to Qatar, and of the amount of any purported interest and depletion deductions (and related cost basis) disallowed by the IRS.

---

[6] The United States is not listing here matters that are not contested, such as the terms of the agreements.  Those facts are discussed in the United States' proposed findings of fact and summary judgment motions, filed separately.  Additionally, the United States reserves the right to contest other facts that may be presented at trial, including disputing the opinions of ExxonMobil's expert witnesses.

**IV.    Contested Issues of Law**

    **A.    ExxonMobil's Contested Issues of Law[7]**

1.    Whether Al Khaleej Gas is a partnership under federal tax law.

2.    Whether the Al Khaleej Gas production payment satisfies the requirements for a carved-out production payment under federal tax law.  *See* 26 U.S.C. 636(a); Treas. Reg. § 1.636-3(a)(1).

3.    Whether the Al Khaleej Gas production payment is debt under common law principles.

    **B.    United States' Contested Issues of Law**

1.    In substance, is the ARDPSA a lease with production sharing for federal income tax purposes based on its undisputed terms?

2.    Does the ARDPSA, in substance, contain a production payment that meets the technical requirements of § 636(a) and Treasury Regulation § 1.636-3, including that it be materially limited and of shorter duration than the mineral interest it allegedly burdens?

3.    If the ARDPSA is neither a lease nor contains a production payment, does the ARDPSA provide for a "debt" owed by ExxonMobil to Qatar?

4.    Is there a separate partnership entity created by ExxonMobil and Qatar recognized for tax purposes, and if so, what are its terms, its partnership and partner items, its assets and liabilities, the inception date, and the parties' interests?[8]

5.    Are any of the "partnership" transactions ExxonMobil alleges respected for U.S. tax purposes, including whether there was any "'sale" of mineral rights, any property from which

---

[7] To the extent that the Court deems any of the contested issues of law to be issues of fact or mixed issues of fact and law, ExxonMobil submits them as such.

[8] Depending on the answers to issues 1–3, the Court may not need to reach issues 4–7.

to carve a production payment, and whether it holds any depletable items, and if so, what are their values?

      6.     Does the alleged partnership lack economic substance or a non-tax purpose?

      7.     Does Appendix G and the alleged production payment lack economic substance or a non-tax purpose?

## V.    **Estimated Length of Trial**

### A.    **ExxonMobil's Estimate**

ExxonMobil anticipates that the trial will last five days in accordance with the Amended Scheduling Order entered by this Court.  (ECF 49.)  Pursuant to the Court's September 6, 2023 bifurcation order, this first phase of the trial will address "ExxonMobil's entitlement to a deduction for production payments"—specifically, "whether [Al Khaleej Gas] is a valid partnership under federal law and whether the transactions in question are production payments for federal tax purposes, which would entitle ExxonMobil to a tax deduction."  (ECF 50 at 2-3.) This first phase of the trial will not address the "calculation of the amount of tax refund owed to ExxonMobil," or "the validity of the penalties ExxonMobil incurred for underpayment of issues," which were bifurcated.  (*Id.*; *see supra* at 2 n.3.)

ExxonMobil does not believe that time should be allocated equally between the parties. Among other reasons, Defendant has refused to stipulate to facts that it has no basis to dispute— for example, that the useful life of the reservoirs in the North Field (the world's largest non-associated gas field) were expected to exceed the term of the production payment—necessitating testimony that would otherwise be unnecessary.  Defendant has also thus far declined to stipulate to the admissibility of ExxonMobil business records, which would similarly streamline the trial. Accordingly, ExxonMobil requests that the Court allocate 60% of the time at trial to ExxonMobil and the remaining 40% to Defendant.

### B.     United States' Estimate

The United States believes that one week of trial should be more than sufficient, with the time divided equally between the parties.

## VI.     Additional Matters that May Aid in the Disposition of the Case

### A.     Pretrial Conference

The parties request that a pretrial conference occur at the Court's convenience prior to the start of trial.

### B.     ExxonMobil's Additional Matters

ExxonMobil requests that the Court resolve three issues in advance of trial because they will streamline the presentation of evidence and they may require argument before the Court. ExxonMobil believes that these issues can be resolved most efficiently at a pretrial conference.

*First*, ExxonMobil has filed a motion seeking a ruling from the Court that specified categories of documents are admissible as business records.  ExxonMobil has provided Defendant with declarations from two business records custodians establishing the admissibility of certain business records pursuant to Federal Rules of Evidence 902(11)-(12) and 803(6). Because those documents are self-authenticating under Federal Rule of Evidence 902, they should be admitted into evidence without testimony from a live witness.  While the parties continue to discuss the admissibility of these documents, Defendant has not to date agreed to their admissibility.  Accordingly, in the interest of preserving its rights (and in light of the applicable deadlines under the Amended Scheduling Order (ECF 49)), ExxonMobil has filed a motion to admit these documents into evidence.  ExxonMobil seeks a ruling on those documents before trial because ExxonMobil may otherwise need to call multiple witnesses—including a witness who is located abroad—who would otherwise be unnecessary.  ExxonMobil reserves the right to supplement the motion to address additional documents.  Whether the motion will apply

to additional categories of documents will depend on Defendant's position as to other admissibility issues.

*Second*, ExxonMobil has filed a motion to present certain confidential exhibits and testimony under seal, consistent with the practice permitted in a prior trial concerning ExxonMobil's tax years 2006 to 2009. This relief is necessary because ExxonMobil has had to disclose in discovery—and will need to present at trial—confidential and proprietary commercial information and documents, which if disclosed may result in competitive harm to ExxonMobil.

*Third*, ExxonMobil has filed a motion to exclude the full testimony from Defendant's sole expert on the grounds that she is unqualified and her opinions are unreliable. (ECF 65.) That motion is now fully briefed. (*See* Defendant's Opposition (ECF 75); ExxonMobil's Reply (ECF 84).) Resolving that motion now will streamline trial by limiting the need for unnecessary and inadmissible testimony from Defendant's purported expert.

In addition, ExxonMobil requests that, no later than 45 days after the trial ends, the following materials may be filed with the Court: (i) amended proposed findings of fact and conclusions of law; and (ii) a post-trial brief, which shall not exceed 40 double-spaced pages (excluding the signature page, table of contents, and table of authorities). ExxonMobil also requests to defer closing arguments until after the submissions of amended proposed findings of fact and conclusions of law and post-trial briefs.

ExxonMobil believes that consideration of certain foreign law issues will help to aid the disposition of this case. Accordingly, ExxonMobil has given notice of its intent to present evidence regarding issues of foreign law pursuant to Federal Rule of Civil Procedure 44.1 and filed the required notice on February 9, 2024. (Notice of Intent to Rely on Foreign Law (ECF 68).) That evidence is undisputed.

### C.     United States' Additional Matters

The United States opposes ExxonMobil's broad request to seal portions of the trial.  As in the prior case, any meritorious requests can be addressed item by item.

The United States has not filed any *Daubert* motions regarding ExxonMobil's expert witnesses.  The problems and irrelevance of their opinions will be addressed in cross-examination.

The United States has filed a motion for partial summary judgment, which would obviate the need for the trial in mid-April.  *See* ECF Nos. 69-71.

Whether any post-trial briefing or additional findings and conclusions are necessary should be addressed after trial.

Respectfully Submitted:

DAVIS POLK & WARDWELL LLP

By: */s/ James P. Rouhandeh*

James P. Rouhandeh*
james.rouhandeh@davispolk.com
Antonio J. Perez-Marques*
antonio.perez@davispolk.com
Lara Samet Buchwald*
lara.buchwald@davispolk.com
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Sean Stefanik*
sean.stefanik@davispolk.com
901 15th Street, NW
Washington, DC 20005
(202) 962-7000
*Admitted *pro hac vice*

HOLLAND & KNIGHT LLP

Emily A. Parker
State Bar No. 15482500
emily.parker@hklaw.com
Mary A. McNulty
State Bar No. 13839680
mary.mcnulty@hklaw.com
Leonora S. Meyercord
State Bar No. 24074711
lee.meyercord@hklaw.com
J. Meghan McCaig
State Bar No. 24070083
meghan.mccaig@hklaw.com
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 964-9501 (Fax)

*Attorneys for Plaintiff*
*Exxon Mobil Corporation*

UNITED STATES

By: */s/ Cory A. Johnson*

Cory A. Johnson
Senior Litigation Counsel
Ryan D. Galisewski
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 26
Washington, D.C. 20044
202-307-3046 (v)
202-514-9440 (fax)
Cory.A.Johnson@usdoj.gov
Ryan.D.Galisewski@usdoj.com

Jonathan L. Blacker
Trial Attorney, Tax Division
Christian A. Orozco
Trial Attorney, Tax Division
U.S. Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
214-880-9765 (v)
214-880-9741/9742/9774 (f)
Jonathan.Blacker2@usdoj.gov
Christian.A.Orozco@usdoj.gov

*Attorneys for Defendant*
*United States of America*

Signed _____, 2024.

_____
David C. Godbey
Chief United States District Judge