**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| EXXON MOBIL CORPORATION,<br><br>Plaintiff,<br><br>- against -<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL ACTION NO. 3:22-CV-00515-N |

**PLAINTIFF EXXON MOBIL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON REFUND COMPUTATIONS, PENALTIES, AND INTEREST**

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ....................................................1

ARGUMENT ....................................................4

I. ExxonMobil Is Entitled to Summary Judgment on Its Claim for a Refund of Taxes ..........4

A. ExxonMobil Is Entitled to Deduct the Entirety of the AKG Production Payment Interest Expense ....................................................5

B. The Production Payment Interest Expense Is Properly Apportioned Among ExxonMobil's U.S. and Foreign Source Income ....................................................9

II. ExxonMobil Is Entitled to Summary Judgment on Its Claim for a Refund of Penalties ....................................................11

A. The Penalties Imposed on ExxonMobil by the IRS ....................................................12

B. The Al Khaleej Gas Penalties Were Illegally Assessed and Should Be Refunded ....................................................14

C. The Purchase Transaction and Change in Accounting Method Penalties Were Illegally Assessed and Should Be Refunded ....................................................16

1. The Negligence Penalties Are Foreclosed by This Court's Prior Ruling that ExxonMobil Satisfies the Reasonable Basis Standard ............16

2. The Substantial Understatement and Disregard of Rules and Regulations Penalties Were Illegally Assessed Because ExxonMobil Satisfies the Reasonable Basis and Adequate Disclosure Defense ....................................................19

3. Even if Section 6662 Imposed a Subjective Requirement for the Reasonable Basis Defense, ExxonMobil Also Meets that Standard ..........21

4. The Change in Accounting Method Penalties Were Illegally Assessed Because There Was No Change in Method of Accounting and ExxonMobil Satisfies the Substantial Authority Defense ....................................................22

III. ExxonMobil Is Entitled to Summary Judgment on Its Claims for Interest ........................24

CONCLUSION ....................................................26

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Anderson v. Helvering*,
310 U.S. 404 (1940) .................................................................................................... 21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................... 4

*Burditt v. Comm'r*,
T.C. Memo 1999-117 .................................................................................................. 19

*Chemtech Royalty Assocs. v. United States*,
823 F.3d 282 (5th Cir. 2016) ....................................................................................... 19

*Christie v. United States*,
237 U.S. 234 (1915) .................................................................................................... 21

*DeShazo v. Nations Energy Co.*,
286 F. App'x 110 (5th Cir. 2008) ................................................................................ 18

*Exxon Mobil Corp. v. United States*,
513 F. Supp. 3d 734 (N.D. Tex. 2021), *aff'd*, 43 F.4th 424 (5th Cir. 2022) ................. *passim*

*Exxon Mobil Corp. v. United States*,
43 F.4th 424 (5th Cir. 2022) ................................................................................. 17, 23

*Goldring v. United States*,
15 F.4th 639 (5th Cir. 2021) ........................................................................................ 25

*Knight-Ridder Newspapers, Inc. v. United States*,
743 F.2d 781 (11th Cir. 1984) ..................................................................................... 23

*Matthies v. Comm'r*,
134 T.C. 141 (2010) .................................................................................................... 19

*Next Level Commc'ns LP v. DSC Commc'ns Corp.*,
179 F.3d 244 (5th Cir. 1999) ................................................................................ 17, 18

*Tate & Lyle, Inc. v. Comm'r*,
103 T.C. 656 (1994), *rev'd on other grounds*, 87 F.3d 99 (3d Cir. 1996) ............................ 22

*Thomas v. Perkins and Shamrock Oil & Gas Corp. v. Comm'r*,
346 F.2d 377 (5th Cir. 1965) ....................................................................................... 21

*TIFD III-E Inc. v. United States*,
8 F. Supp. 3d 142 (D. Conn. 2014),
*rev'd on other grounds*, 604 F. App'x 69 (2d Cir. 2015) .................................................... 19

*Vick v. Phinney*,
414 F.2d 444 (5th Cir. 1969) .......... 25

*Wells Fargo & Co. v. United States*,
957 F.3d 840 (8th Cir. 2020) .......... 19, 22

STATUTES & RULES

26 U.S.C. § 446 .......... 22
26 U.S.C. § 707 .......... *passim*
26 U.S.C. § 6603 .......... 24
26 U.S.C. § 6662 .......... *passim*
26 U.S.C. § 6676 .......... *passim*
Fed R. Civ. P. 56(a) .......... 4
Rev. Proc. 94-69, 1994-2 C.B. 804 .......... 20
Rev. Proc. 2005-18, 2005-1 C.B. 798 .......... 24
Rev. Proc. 2011-13, 2011-3 I.R.B. 318, § 4.02(3) .......... 20
Rev. Proc. 2012-15, 2012-I.R.B. 369, § 4.02(3) .......... 20
Temp. Treas. Reg. § 1.861-9T(a) .......... 9
Treas. Reg. § 1.446-1(e)(2) .......... 21, 22
Treas. Reg. § 1.6662 .......... *passim*
Treas. Reg. § 1.707-1(c) .......... 9
Treas. Reg. § 1.707-4(a)(4) .......... 9
Treas. Reg. § 1.861-9(a) .......... 10

Plaintiff Exxon Mobil Corporation ("ExxonMobil") respectfully submits this memorandum of law in support of its motion for partial summary judgment on refund computations, penalties, and interest.[1]

**PRELIMINARY STATEMENT**

Following a week-long trial in April 2024, the Court concluded that "ExxonMobil's tax treatment correctly reflects both the tax law and the economic substance of the transaction."[2] The Court further held that ExxonMobil "was lawfully entitled to deduct interest expense" because the Al Khaleej Gas ("AKG") production payment "meets the statutory requirements of Section 636(a)" of the Tax Code.[3]

There are two issues that were bifurcated from the merits phase of the case and that remain for the Court to decide: (i) the amount of the tax refund owed to ExxonMobil, and (ii) the validity of penalties paid by ExxonMobil in connection with the AKG production payment and the issues that were previously decided by the Court for the 2006 to 2009 tax years. The parties have worked to narrow any disputes.[4] However, several disputed questions of law remain for the

---

[1] Citations in the form JX-__, PX-__, or DX-__ refer to exhibits that were admitted into evidence at the merits trial. All cited exhibits, including exhibits previously admitted into evidence, are contained in the Appendix filed in connection with this motion ("App."), which includes the Declaration of Lara Samet Buchwald, dated May 16, 2025, and the exhibits thereto.

[2] Findings of Fact and Conclusions of Law (ECF No. 191) ("Post-Trial Decision") at 1, App. 18.

[3] *Id.* at 15 ¶ 2, 39, App. 32, 56.

[4] The parties have filed (i) a Stipulation Regarding Tax and Penalty Computations (ECF No. 200) ("Tax and Penalty Stipulation"), App. 79-84, which memorializes the tax and penalty issues that the parties have resolved and the facts to which the parties have agreed, and (ii) a Stipulation Regarding Deficiency (Underpayment) Interest Computations (ECF No. 201) ("Interest Stipulation"), App. 68-77, which memorializes the parties' agreements regarding the computation of interest on amounts owed to ExxonMobil.

Court to resolve. There are no genuine disputes of material fact that bear on those legal issues, and ExxonMobil is entitled to summary judgment in its favor.

***First***, ExxonMobil is entitled to summary judgment on the amount of the tax refund that it is owed for the AKG production payment. The central remaining issue in dispute is whether the AKG partnership's allocation of the production payment interest expense to ExxonMobil should be respected. Applying federal tax law to the Court's post-trial findings, AKG's allocation of the interest expense to ExxonMobil was correct as a matter of law. Following the 2006 recapitalization, the State of Qatar received two interests: the production payment (in its capacity as lender) and the Residual Profit Share (in its capacity as partner). The Residual Profit Share payments do not carry with them an allocation of any partnership items, including the production payment interest expense that was incurred by the partnership, because they qualify as payments under Section 707(c). Therefore, federal tax law mandates that all of the interest expense be allocated to ExxonMobil. This result is consistent with the partners' negotiated agreement that was memorialized in the Amended and Restated Development and Production Sharing Agreement ("ARDPSA") nearly two decades ago. To avoid this result, Defendant effectively seeks to relitigate the Court's merits decision by advancing positions that would deprive ExxonMobil of the benefit of a tax treatment that the Court has already ruled was correct. Those positions are without merit and should not prelude summary judgment in ExxonMobil's favor.

***Second***, ExxonMobil is entitled to summary judgment on its claim for a refund of penalties assessed by the Internal Revenue Service ("IRS"). As to the AKG production payment penalties, the Court concluded that ExxonMobil's tax treatment was correct.[5] That, alone,

[5] Post-Trial Decision at 1, App. 18.

establishes that the penalties should be refunded because Defendant's position is based on the premise that ExxonMobil's tax position was *incorrect*. As to the remaining penalties at issue for tax years 2010 and 2011, the underlying tax positions related to ExxonMobil's treatment of the Qatar Development and Fiscal Agreements ("DFAs") and the Malaysia Production Sharing Contracts ("PSCs") are identical to the issues that were litigated in the prior case concerning ExxonMobil's tax years 2006 to 2009 (the "2006-2009 Litigation"). In the 2006-2009 Litigation, this Court ruled in ExxonMobil's favor on penalties, concluding that penalties were unlawful, and the Fifth Circuit affirmed. This Court's prior decision is entitled to preclusive effect, and those penalties are improper on additional grounds in any event.

***Third***, while the parties have agreed that ExxonMobil will be entitled to payments of interest on amounts that it is owed, and have largely agreed on how interest is to be computed under the Tax Code, there is one narrow question of law that remains in dispute. In short, ExxonMobil made certain deposits with the IRS under Section 6603 for tax year 2012 that can be used to suspend underpayment interest for tax years 2010 and 2011 for periods of time when the IRS had the free use of ExxonMobil's money. ExxonMobil is entitled to summary judgment on that issue as well.

In sum, ExxonMobil respectfully requests that summary judgment be entered in its favor on these three remaining issues, and that the parties be directed to confer on final interest calculations within thirty (30) days of the Court's decision, after which a final judgment may be entered.

## ARGUMENT

A party is entitled to summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Here, there are no genuine disputes of fact that bear on (i) the amount of the tax refund owed to ExxonMobil, (ii) ExxonMobil's entitlement to a refund of penalties assessed by the IRS, or (iii) the use of certain deposits made for tax year 2012 to suspend underpayment interest for tax years 2010 and 2011. ExxonMobil is therefore entitled to summary judgment on all three remaining issues.

### I. ExxonMobil Is Entitled to Summary Judgment on Its Claim for a Refund of Taxes

In the first phase of this case, the Court concluded that the AKG production payment "meets the requirements of the Treasury Regulations and Section 636(a)," and as a result, "the production payment 'shall' be treated 'as if it were' a mortgage loan for tax purposes," which "entitle[s] ExxonMobil to deduct interest expense."[6] Pursuant to that ruling, ExxonMobil seeks a refund of the approximately $274 million in taxes that the IRS assessed and ExxonMobil paid for tax years 2010 and 2011 based on the IRS's erroneous and already rejected position that the AKG production payment did *not* qualify for treatment as debt under Section 636(a).[7]

There are no genuine disputes of material fact that bear on the amount of the refund that ExxonMobil is owed. Indeed, the parties have stipulated to the relevant facts (including the total

[6] Post-Trial Decision at 16 ¶ 3, App. 33.

[7] ExxonMobil seeks a refund of $129,814,944 for 2010 and $143,621,810 for 2011 for tax paid on the deductions disallowed for the production payment, plus an additional $526,139 for 2011 that results from a correlative adjustment under Section 199. (*See* Ex. 11 (ExxonMobil's Amended Response to Interrogatory No. 22), App. 198-205; *infra* note 22 (addressing correlative adjustments).)

amount of the AKG production payment interest expense at issue).[8] The principal issue in dispute is a legal question that relates to one input into the refund calculation—specifically, whether the production payment interest expense should be allocated to ExxonMobil in its entirety for 2010 and 2011, as agreed by the parties to the AKG partnership and documented in their agreement governing the partnership.

### A. ExxonMobil Is Entitled to Deduct the Entirety of the AKG Production Payment Interest Expense

Applying federal tax law to the facts that the Court has already adjudicated at trial, the production payment interest expense should be allocated to ExxonMobil in its entirety. This is because the only amounts that the State of Qatar receives from AKG in its capacity *as a partner*—and which *could* give rise to an allocation to Qatar of the partnership's interest expense under applicable tax law—are the Residual Profit Share payments. But those Residual Profit Share payments qualify as payments for the use of capital under Section 707(c) of the Tax Code, and therefore they do not carry with them a "distributive share"—tax parlance for an allocation of partnership items, including interest expense. As a result, federal tax law mandates that all of the production payment interest expense be allocated to ExxonMobil.

As ExxonMobil demonstrated at trial, the AKG production payment was incorporated into the parties' amended agreement, the ARDPSA, as part of an expansion and recapitalization of the partnership.[9] This Court concluded, in relevant part, that the AKG production payment

---

[8] *See* Tax and Penalty Stipulation ¶¶ 1-2, App. 80.

[9] *See, e.g.*, Post-Trial Decision at 10-11 ¶¶ 27-30, App. 27-28; JX-002 (ARDPSA) App'x G, App. 266-77; Ex. 14 (Apr. 17, 2024 Trial Tr., Babin) 145:21-25, App. 234 ("[W]hen the ARDPSA was executed . . . there [were] several things going on at the same time, one of which was the government was contributing additional production rights in part in exchange for a production payment . . . .").

did two things. *First*, the production payment "recapitalized the State of Qatar's equity interest in the partnership" because the State of Qatar "redeemed part of its equity interest in Al Khaleej Gas in exchange for [] the production payment."[10] *Second*, the production payment allowed the partnership to purchase additional mineral rights from the State of Qatar, which was necessary to increase production volume and meet growing domestic demand for gas.[11] Thus, "[r]ather than taking solely a profit share, as it did under the [Development and Production Sharing Agreement], the State of Qatar took a reduced profit share" (i.e., the Residual Profit Share) "and a production payment" (i.e., an interest that "is, in substance, debt").[12]

There is also no dispute that in Article 39.14 of the ARDPSA—the same provision that memorialized the treatment of AKG as a partnership for U.S. tax purposes—the partners agreed that the Residual Profit Share would be treated by AKG as a payment "pursuant to Section 707(c)" of the Tax Code.[13] Indeed, Troy Babin—the ExxonMobil tax attorney who testified at trial about the negotiation of the production payment—memorialized the treatment of the Residual Profit Share as a Section 707(c) payment in a May 15, 2007 memorandum that set forth ExxonMobil's return position for tax reporting purposes.[14] And ExxonMobil has consistently

---

[10] Post-Trial Decision at 11 ¶ 30, App. 28; *see also id.* at 35 ¶ 48, App. 52 ("One component of [the ARDPSA] was the parties' agreement to recapitalize the partnership with a combination of debt (i.e., the production payment) and equity.").

[11] As the Court concluded, "the production payment was carved out of all the mineral interests held by the partnership," including "the mineral rights that the State of Qatar originally contributed in the DPSA, *plus* the additional mineral rights contributed in the ARDPSA." (Post-Trial Decision at 11 ¶ 30, App. 28 (emphasis added).) Thus, the production payment "burdened the mineral interests contributed to the partnership by the State of Qatar under both the DPSA and the ARDPSA." (*Id.*)

[12] Post-Trial Decision at 11 ¶ 30, App. 28 *id.* at 35 ¶ 48, App. 52.

[13] JX-002 (ARDPSA) art. 39.14, App. 264.

[14] DX-032 (May 15, 2007 Babin memorandum), App. 279-80.

deducted interest expense in accordance with that agreement in its tax returns, including on its 2006 – 2009 returns, which the IRS audited and did not challenge.[15]

The parties' treatment of the Residual Profit Share payments as payments under Section 707(c) of the Tax Code is correct. Section 707(c) provides, in relevant part, that "[t]o the extent [i] determined *without regard to the income of the partnership*, payments [ii] *to a partner* [iii] for services or *the use of capital* shall be considered as made to one who is not a member of the partnership." 26 U.S.C. § 707(c) (emphasis added). The Residual Profit Share payments satisfy the three statutory criteria based on the facts as found by this Court.

*First*, the Residual Profit Share payments are paid "to a partner"—namely, the State of Qatar.[16]

*Second*, they are also payments "for . . . the use of capital"—specifically, for use of the minerals that the State of Qatar contributed to the AKG partnership, which the partnership used to produce gas and generate revenue.[17]

*Third*, AKG pays the Residual Profit Share "without regard to the *income* of the partnership." 26 U.S.C. § 707(c) (emphasis added). Under Article 19 of the ARDPSA, the parties share in Profit Petroleum, which are production revenues that depend on the volume and value of the extracted mineral. Profit Petroleum is computed without reference to AKG's

[15] Post-Trial Decision at 14 ¶ 42, App. 31; PX-247 – PX-250 (AKG partnership workpapers for 2006 to 2009), App. 723-804.

[16] Post-Trial Decision at 15-16 ¶ 2, App. 32-33 (concluding that AKG is a partnership, with ExxonMobil and the State of Qatar as partners); *id.* at 20-21 ¶ 16, App. 37-38 (concluding that the Residual Profit Share was Qatar's "equity interest in the partnership").

[17] Post-Trial Decision at 19 ¶ 12, App. 36 (concluding that "the State of Qatar contributed rights to a significant volume of known minerals," and that these contributions "are treated as capital contributions to the Al Khaleej Gas partnership under federal tax law").

income and differs meaningfully from "income" for several reasons. As a threshold matter, ExxonMobil's cost recovery is subject to a 40% cap. This means that Qatar may receive a Residual Profit Share even if AKG has no profits or net income. For example, the evidence shows that in the [redacted].[18] Thus, the starting point for the parties' share (Profit Petroleum) is not income.

Further, Profit Petroleum is split between the partners using the "R Factor," which is also determined by the volume and value of the extracted mineral, and not by reference to the partnership's income. This agreed-upon split of Profit Petroleum—which, in turn, determines the amount of the Residual Profit Share—is reflected in Article 19.8.1:[19]

[redacted]

Under the ARDPSA, [redacted] As a matter of plain mathematics, the partnership's income plays no role in the calculation. In this regard too, the return to Qatar from the Residual Profit Share is demonstrably

[18] *See* PX-191 (SOPC for Q3 2007), App. 824-37; PX-192 (SOPC for Q4 2007), App. 887-99; PX-604 (Nov. 3, 2023 Expert Report of David Plastino) at 96, App. 104.

[19] JX-002 (ARDPSA) art. 19.8.1, App. 261-62.

computed “without regard to the income of the partnership.” 26 U.S.C. § 707(c); *see, e.g.*, Treas. Reg. § 1.707-1(c), Ex. 3-4 (a payment determined by reference to the partnership’s *taxable* income is not a Section 707(c) payment); Treas. Reg. § 1.707-4(a)(4), Ex. 1 (a payment determined by reference to the partnership’s *net taxable* income is not a Section 707(c) payment). Instead, as volume and/or price increases, the Residual Profit Share increases even if AKG’s income remains the same. For these reasons, the Residual Profit Share payments qualify as payments under Section 707(c).

After the partnership was recapitalized in 2006, the Residual Profit Share payments are the only amounts that the State of Qatar receives as a partner, as opposed to as a lender.[20] Because the Residual Profit Share payments are payments under Section 707(c), they do not carry with them any distributive share. *See* Treas. Reg. § 1.707-1(c), Ex. 3-4 (showing that the Section 707(c) payment does not carry with it a distributive share of partnership items). And because the Residual Profit Share payments are the only amounts that the State of Qatar receives as a partner, no other partnership items—including the production payment interest—are allocated to the State of Qatar. Thus, AKG properly allocated 100% of the interest expense to ExxonMobil because ExxonMobil is the only partner that receives a distributive share.

---

[20] *See supra* notes 10-12. The State of Qatar also received production payments from the partnership under the ARDPSA—but as the Court concluded, the production payment is a “separately transferrable” interest that is treated “as if it were” debt under Section 636(a) for federal tax purposes. (Post-Trial Decision at 13 ¶ 37, 16 ¶ 3, 26-27 ¶ 29, App. 30, 33, 43-44.) Because of that treatment as debt, the State of Qatar receives the production payment in its capacity as a *lender*, not a *partner*, and the production payment does not carry with it a distributive share.

### B. The Production Payment Interest Expense Is Properly Apportioned Among ExxonMobil's U.S. and Foreign Source Income

Once the interest expense is allocated to ExxonMobil, it is then apportioned among all of ExxonMobil's U.S. and foreign income sources under the well-established rule that governs interest expense deductions for U.S. taxpayers. *See* Temp. Treas. Reg. § 1.861-9T(a) (providing for the apportionment of interest expense among all income producing activities and assets of the taxpayer); Treas. Reg. § 1.861-9(a) (incorporating by reference Temp. Treas. Reg. § 1.861-9T(a)-(b)). The U.S. and foreign apportionment percentages that apply for this purpose have been agreed to by the parties.[21] There is no genuine dispute of fact on this issue.

* * * * *

For these reasons, ExxonMobil is entitled to summary judgment on its claim for a refund of taxes associated with the AKG production payment. When the production payment interest expense is allocated to ExxonMobil (as required under the partnership agreement and by federal tax law for the reasons explained above) and apportioned among all of ExxonMobil's domestic and foreign income sources, the undisputed evidence shows that the total refund amount owed to ExxonMobil is $129,814,944 for tax year 2010 and $143,621,810 for tax year 2011.[22]

---

[21] Tax and Penalty Stipulation ¶ 4, App. 80-81.

[22] Ex. 11 (ExxonMobil's Amended Response to Interrogatory No. 22) at 4, App. 201; Exs. 55, 57 (2010 and 2011 tax computations spreadsheets), App. 966-1000, 1019-1056. In addition to the tax refund owed to ExxonMobil in connection with the AKG production payment, the parties also have stipulated that ExxonMobil is entitled to a tax refund of $6,373,074 for 2010 and $37,132,569 for 2011 due to a correlative adjustment made under Section 199 of the Tax Code to reflect disallowed interest expense on the DFAs and PSCs. That issue is unrelated to the AKG production payment, and those amounts are separate and independent of the refund owed to ExxonMobil in connection with the AKG production payment. (Tax and Penalty Stipulation ¶ 9, App 82-83.) ExxonMobil is also entitled to an additional $526,139 for tax year 2011 due to a correlative adjustment under Section 199 that results from the AKG production payment refund amounts described above. Ex. 11 (ExxonMobil's Amended Response to Interrogatory No. 22) at 4, App. 201; Ex. 56 (MID calculation spreadsheet), App. 1001-1018.

## II. ExxonMobil Is Entitled to Summary Judgment on Its Claim for a Refund of Penalties

ExxonMobil is also entitled to a refund of approximately $182 million in penalties assessed by the IRS for tax years 2010 and 2011.[23] The Court has already ruled in ExxonMobil's favor on the issues as to which the penalties were imposed. Defendant's refusal to refund those penalty payments is baseless as a matter of law and there are no genuine disputes of fact that preclude summary judgment in ExxonMobil's favor.

The penalties at issue concern two aspects of ExxonMobil's 2010 and 2011 tax returns. The first is ExxonMobil's treatment of the AKG production payment.[24] The AKG production payment was the subject of the week-long trial during the merits phase of this case. As described above, the Court ruled in ExxonMobil's favor, holding that "ExxonMobil's tax treatment of [the production payment] is correct" and "reflects both the tax law and the economic substance of the transaction."[25] As the Court previously recognized, this alone disposes of the related penalties, and there is simply no basis for Defendant's continued refusal to refund those penalties.[26]

The second issue is ExxonMobil's treatment of the Qatar DFAs and Malaysia PSCs as transactions involving purchases rather than mineral leases, and the related position that ExxonMobil's change from lease to purchase treatment for those transactions was not a "change

---

[23] ExxonMobil paid $51,009,333 in penalties related to the AKG production payment ($25,962,989 for tax year 2010 and $25,046,344 for tax year 2011) and $131,458,450 in penalties related to the DFAs and PSCs ($22,101,644 for tax year 2010 and $109,356,806 for tax year 2011). (Tax and Penalty Stipulation ¶ 10, App. 83.)

[24] *See* Ex. 41 (2010-2011 Statutory Notice of Deficiency) at -706, -736, App. 651, 681.

[25] Post-Trial Decision at 1, App. 18.

[26] Bifurcation Order (ECF No. 50) at 3 ("A ruling in ExxonMobil's favor disposes of the penalties issues.").

in method of accounting."[27] These issues were the subject of the 2006-2009 Litigation, as well as briefing during the penalties phase of that case. In the 2006-2009 Litigation, both this Court and the Fifth Circuit ruled in ExxonMobil's favor on the penalty issues, concluding that ExxonMobil was entitled to a refund of all penalties for tax years 2006 to 2009. *See Exxon Mobil Corp. v. United States*, 513 F. Supp. 3d 734, 739-41 (N.D. Tex. 2021), App. 63-65, *aff'd*, 43 F.4th 424, 434 (5th Cir. 2022). Consistent with the Court's and Fifth Circuit's prior analysis and conclusions, these other penalties that the IRS assessed for tax years 2010 and 2011 are erroneous.

### A. The Penalties Imposed on ExxonMobil by the IRS

For 2010 and 2011, the IRS assessed penalties against ExxonMobil under Section 6662 of the Tax Code.[28] Section 6662 sets forth accuracy-related penalties for "an underpayment of tax required to be shown on a return," 26 U.S.C. § 6662(a), including a penalty for substantial understatements or understatements due to negligence or a careless, reckless, or intentional disregard of rules or regulations. 26 U.S.C. § 6662(b)(1), (b)(2), (c), (d)(1)(B).[29]

The Tax Code and Treasury regulations also set forth circumstances in which penalties do not apply. For example, the negligence penalty does not apply if the taxpayer's "return position [] has a ***reasonable basis***," and the disregard of rules or regulations and substantial understatement penalties do not apply if the return position has a reasonable basis and the

---

[27] *See* Ex. 28 (Form 886-A, *Explanation of Items*, Negligence, Disregard of Rules or Regulations), App. 376-79; Ex. 29 (Form 886-A, *Explanation of Items*, Substantial Understatement), App. 380-83.

[28] *See* Ex. 41 (2010-2011 Statutory Notice of Deficiency) at -706, -736, App. 651, 681.

[29] A substantial understatement means an understatement that exceeds the greater of 10% of the tax to be shown on the return or $10 million. 26 U.S.C. § 6662(d)(1)(B).

taxpayer "***adequately disclosed***" the position. Treas. Reg. § 1.6662-3(b)(1) (emphasis added); 26 U.S.C. § 6662(d)(2)(B)(ii) (emphasis added); *see also* Treas. Reg. § 1.6662-3(c). The substantial understatement penalty also does not apply if the return position was supported by "***substantial authority***," which means that "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg. § 1.6662-4(d)(3)(i) (emphasis added). ExxonMobil needs to satisfy only one of the available defenses to be entitled to a refund of the penalties.

The IRS assessed these penalties on the following tax positions reported on ExxonMobil's 2010 and 2011 returns: (i) the AKG production payment; (ii) the Qatar and Malaysia purchase transactions; and (iii) the Qatar and Malaysia method of accounting issue.[30] The chart below summarizes why the 2010 and 2011 penalties are erroneous; each bullet is a separate and independent basis to rule in ExxonMobil's favor. As shown, the Court's prior decisions largely resolve the penalty issues in this case.

| | **Penalties Assessed by the IRS and ExxonMobil's Applicable Defenses** | | |
|---|---|---|---|
| | *Negligence Penalty* | *Disregard of Rule or Regulation Penalty* | *Substantial Understatement Penalty* |
| *AKG Production Payment* | • ExxonMobil's tax treatment was correct (Resolved by post-trial decision, App. 18, 56) | • ExxonMobil's tax treatment was correct (Resolved by post-trial decision, App. 18, 56) | • ExxonMobil's tax treatment was correct (Resolved by post-trial decision, App. 18, 56) |

[30] *See* Ex. 41 (2010-2011 Statutory Notice of Deficiency) at -736, App. 689 (listing penalties assessed in tax years 2010 and 2011 for ExxonMobil RasGas, Inc., ExxonMobil Petroleum and Chemical Holdings, Inc. – Qatargas II, ExxonMobil Exploration and Production Malaysia Inc., and ExxonMobil Petroleum and Chemical Holdings, Inc. – Al Khaleej); Ex. 28 (Form 886-A, *Explanation of Items*, Negligence, Disregard of Rules or Regulations), App. 376-79 (explaining assessment of penalties for the change in method of accounting and sale versus lease issues); Ex. 29 (Form 886-A, *Explanation of Items*, Substantial Understatement), App. 380-83 (same); *see also* Ex. 10 (Defendant's Response to ExxonMobil's Interrogatory No. 10), App. 190-93 (explaining the assessment of penalties to the DFAs, PSCs, and AKG).

| | Penalties Assessed by the IRS and ExxonMobil's Applicable Defenses | | |
|---|---|---|---|
| | *Negligence Penalty* | *Disregard of Rule or Regulation Penalty* | *Substantial Understatement Penalty* |
| | • Reasonable basis for the tax position | • No careless, reckless, or intentional disregard of any rule or regulation | • Substantial authority for the tax position<br>• Reasonable basis for the tax position plus adequate disclosure |
| *Qatar/Malaysia Purchase vs. Lease* | • Reasonable basis for the tax position (issue preclusion applies) | • Reasonable basis for the tax position (issue preclusion applies) plus adequate disclosure | • Reasonable basis for the tax position (issue preclusion applies) plus adequate disclosure |
| *Qatar/Malaysia Change in Accounting Method* | • No change in accounting method requiring IRS consent<br>• Reasonable basis for the tax position (issue preclusion applies) | • No change in accounting method requiring IRS consent<br>• Reasonable basis for the tax position (issue preclusion applies) plus adequate disclosure | • No change in accounting method requiring IRS consent<br>• Reasonable basis for the tax position (issue preclusion applies) plus adequate disclosure<br>• Substantial authority for the tax position |

### B. The Al Khaleej Gas Penalties Were Illegally Assessed and Should Be Refunded

The Court's ruling in the first phase of this case disposes of the AKG production payment penalties. In bifurcating penalties from the merits phase of the case, the Court reasoned that "[a] ruling in ExxonMobil's favor disposes of the penalties issue."[31] Now, despite the Court having

[31] Bifurcation Order (ECF No. 50) at 3. Tellingly, in its briefing on ExxonMobil's bifurcation motion, Defendant never disputed that a ruling in ExxonMobil's favor on the merits of the AKG production payment issue would dispose of the production payment penalties. Rather, Defendant's only argument was that it was *speculative* that ExxonMobil would prevail on its claim that the production payment qualified for treatment as debt under Section 636(a), and that "such speculation does not amount to actual judicial efficiency" warranting bifurcation. (ECF No. 46 at 6.)

ruled in ExxonMobil's favor on the merits, Defendant persists in arguing that ExxonMobil was nonetheless properly penalized for having reported its taxes in a manner that the Court has ruled was "correct." Because ExxonMobil's tax treatment was correct, there is no basis for the accuracy-related penalties assessed by the IRS, which are based on the premise that the tax position was *incorrect*.[32]

As a result, ExxonMobil is entitled to summary judgment on the AKG penalties, and it is owed a refund of $51,009,333.[33]

---

[32] Unwilling to accept this outcome, Defendant advances a new theory to justify the government's retention of AKG production payment penalties: that ExxonMobil deducted *too much* of the production payment interest expense, and therefore ExxonMobil's returns reported understatements of tax. (Ex. 12 (Defendant's Response to ExxonMobil's Seventh Set of Interrogatories), App. 210-221.) Defendant's litigation position—which was never asserted by the IRS audit team that assessed the penalties, and which Defendant raises for the first time more than *nine years* after the penalties were assessed and paid—is baseless. (*See* Ex. 16 (Diminich Apr. 23, 2025 Dep. Tr.) 92:3-11, App. 250 ("Q. As part of the audit process, did the IRS ever analyze whether ExxonMobil would be entitled to an allocation of interest expense in a scenario where the production payment is respected as a carved-out production payment under Section 636(a)? . . . . A. I don't recall any discussion regarding that particular issue.").) For the reasons explained above, the AKG partnership's allocation of the production payment interest expense to ExxonMobil was not only correct, but it was *required* under federal tax law because the State of Qatar receives only Residual Profit Share payments in its capacity as a partner in AKG and no distributive share. (*See supra* at 5-9.) Even assuming, contrary to the facts and the law, that ExxonMobil underreported its taxes because it was not entitled to the allocation of the production payment interest expense or it was not apportioned between U.S.-source and foreign-source income—ExxonMobil is *still* entitled to summary judgment on the production payment penalties because it satisfies multiple penalty defenses. For the reasons described above (*see supra* at 5-9), ExxonMobil's positions had a reasonable basis and were supported by substantial authority.

[33] Tax and Penalty Stipulation ¶ 9, App. 82-83 (detailing the undisputed amounts of the AKG production payment penalties assessed by the IRS and paid by ExxonMobil for tax years 2010 and 2011).

**C. The Purchase Transaction and Change in Accounting Method Penalties Were Illegally Assessed and Should Be Refunded**

As detailed above, the remaining penalties all concern the transactions that the Court analyzed in the 2006–2009 Litigation—namely, the Qatar DFAs and Malaysia PSCs. (*See supra* at 12-14.) The IRS penalized ExxonMobil's tax treatment of those transactions *again* in tax years 2010 and 2011, and Defendant has refused to refund those penalties notwithstanding the Court's decision in the 2006-2009 Litigation.[34] Consistent with the Court's prior analysis of the identical issues, the 2010 and 2011 penalties are also erroneous, and ExxonMobil is entitled to a refund on multiple, independent grounds.

**1. The Negligence Penalties Are Foreclosed by This Court's Prior Ruling that ExxonMobil Satisfies the Reasonable Basis Standard**

The negligence penalties were erroneous because the Court previously held that ExxonMobil's tax positions had a reasonable basis. The objective "reasonable basis" standard that the Court applied before (as a defense to Section 6676 penalties) is the same "reasonable basis" standard that applies here (as a defense to Section 6662 penalties). Under well-established principles of issue preclusion, Defendant may not relitigate that issue now.

The parties litigated the issue of whether ExxonMobil's tax positions for the DFAs and PSCs had a reasonable basis in the 2006-2009 Litigation. For those tax years, the IRS assessed penalties under Section 6676, which applies to erroneous refund claims. The then-operative version of Section 6676 imposed a penalty unless "the refund claim . . . has a reasonable basis."

[34] The penalties for tax years 2010 and 2011 were assessed in 2016—i.e., before ExxonMobil sued for a refund of taxes and penalties in connection with the Qatar DFAs and Malaysia PSCs as to tax years 2006 to 2009, and before the Court issued its merits or penalties decisions in the 2006-2009 Litigation. Nevertheless, since those decisions were issued (and upheld by the Fifth Circuit), Defendant has refused to refund the 2010 and 2011 penalties as to those same tax issues. As a result, ExxonMobil was compelled to seek a refund of those penalties for tax years 2010 and 2011 in this action.

26 U.S.C. § 6676(a) (2007) (Pub. L. 110-28 § 8247, 121 Stat. 190, 204 (2007)). The Court interpreted that language as applying an objective standard, and it held that ExxonMobil's tax positions—on both the purchase vs. lease issue and the change in accounting method issue—had an objectively reasonable basis. It therefore concluded that the penalties were unlawful. *Exxon Mobil*, 513 F. Supp. 3d at 739-41, App. 63-65.[35] The Fifth Circuit affirmed. *See Exxon Mobil Corp. v. United States*, 43 F.4th 424, 434 (5th Cir. 2022).[36]

Issue preclusion bars Defendant from arguing that ExxonMobil's tax positions on the DFAs and PSCs lacked a reasonable basis. Under Fifth Circuit law, a party may not relitigate an issue where "the issue at stake [is] identical to the one involved in the prior action," the issue was "actually litigated in the prior action," and "the determination of the issue in the prior action [was] a necessary part of the judgment in that earlier action." *Next Level Commc'ns LP v. DSC Commc'ns Corp.*, 179 F.3d 244, 250 (5th Cir. 1999). Each requirement is satisfied here.

*First*, the issue here is identical to the issue in the prior action. There is no dispute that the penalties imposed for tax years 2010 and 2011 concern the same transactions—the Qatar DFAs and the Malaysia PSCs—that were at issue in the 2006-2009 Litigation.[37] Nor is there any

---

[35] On the purchase issue (which was tried on the merits), the Court "readily" concluded that "Exxon Mobil's [] position was reasonably based on one or more" relevant authorities. *Exxon Mobil*, 513 F. Supp. 3d at 739, App. 63. The Court also concluded that ExxonMobil's position on the change in accounting method issue—that "the change from mineral lease to sale treatment was a whether, not when, change and thus not an impermissible change in accounting method"—"satisfie[d] the reasonable basis standard." *Id.* at 741, App. 65 (holding that ExxonMobil "reasonably cited" cases supporting its position that "a change in method of accounting deals with *when*, not *whether*, an item is includable in income or allowed as a deduction").

[36] The Fifth Circuit did not directly address this Court's holding that ExxonMobil's position regarding the change from lease to purchase treatment satisfied the reasonable basis standard.

[37] Tax and Penalty Stipulation ¶ 11, App. 83.

dispute that, for both sets of tax years, penalties were assessed in connection with identical tax positions: (i) ExxonMobil's treatment of the DFAs and PSCs as purchases, and (ii) ExxonMobil's position that the change from lease to purchase treatment for those transactions was not a change in method of accounting.

*Second*, the reasonable basis defense was "actually litigated" in the prior action, *Next Level*, 179 F.3d at 250—it was subject to extensive briefing, and the Court ruled in ExxonMobil's favor. *Exxon Mobil*, 513 F. Supp. 3d at 739-41, App. 63-65.

*Third*, the Court's determination of that issue was a "necessary part of the judgment in that earlier action," *Next Level*, 179 F.3d at 250, because the Court's conclusion that ExxonMobil's tax positions had a reasonable basis was necessary to the Court's judgment that the penalties were erroneous and that ExxonMobil was entitled to a refund. *See Exxon Mobil*, 513 F. Supp. 3d at 739-41, App. 63-65.

Defendant's only response is to argue that the penalties in the 2006-2009 Litigation were imposed under a different section of the Tax Code. But that is a distinction without a difference. The reasonable basis defense to penalties under both Section 6676 (for positions taken on a refund claim, as in the 2006-2009 Litigation) and Section 6662 (for positions taken on a tax return, as in this case) is the same: it is an objective standard that looks solely to whether the *tax position* had a reasonable basis. *See Next Level*, 179 F.3d at 255 ("It does not matter that the claims in each suit are different, or that the subject matter of each suit is different, so long as the issue litigated in each suit is identical.").[38] For Section 6662, the Treasury regulations expressly provide that "[a] return position that has a reasonable basis . . . is not attributable to negligence."

[38] *See also, e.g., DeShazo v. Nations Energy Co.*, 286 F. App'x 110, 114-18 (5th Cir. 2008) (holding that the accrual date determined in one suit had preclusive effect in a later suit because the same legal standard was at issue).

Treas. Reg. § 1.6662-3(b)(1). Thus, the question is whether the *return position* has a reasonable basis, not whether the *taxpayer* had a reasonable basis for the position that it adopted.[39] Accordingly, the taxpayer need not produce evidence that it actually relied on the relevant authorities. This is no different from the reasonable basis defense that the Court adjudicated in the 2006-2009 Litigation.[40]

For these reasons, Defendant may not relitigate the Court's prior holding that ExxonMobil's tax positions had a reasonable basis, and the Court's prior decision disposes of the negligence penalties in their entirety.

**2. The Substantial Understatement and Disregard of Rules and Regulations Penalties Were Illegally Assessed Because ExxonMobil Satisfies the Reasonable Basis and Adequate Disclosure Defense**

The substantial understatement and disregard of rules and regulations penalties are unlawful because ExxonMobil satisfies the reasonable basis plus adequate disclosure defense, which requires (i) a reasonable basis for the return position (like the negligence penalty) and (ii) adequate disclosure of the position. *See* 26 U.S.C. § 6662(d)(2)(B)(ii); Treas. Reg.

---

[39] *See, e.g.*, *TIFD III-E Inc. v. United States*, 8 F. Supp. 3d 142, 151 (D. Conn. 2014), *rev'd on other grounds*, 604 F. App'x 69 (2d Cir. 2015) (explaining that "a review for reasonableness is an objective assessment, one that does not consider an individual's actual state of mind," and holding that "Section 1.6662-3 reflects this accepted standard, ascribing 'reasonable basis' to the tax position, not the taxpayer"); *Burditt v. Comm'r*, 77 T.C.M (CCH) 1767 (1999) (treating reasonable basis as an objective test with no consideration of whether the taxpayer consulted and relied upon the legal authorities providing the reasonable basis); *Matthies v. Comm'r*, 134 T.C. 141, 154 (2010) (same).

[40] Indeed, as this Court previously observed, the IRS itself has noted that "reasonable basis" in Section 6676 (before the 2015 amendment) had the same meaning as "reasonable basis" in Section 6662. *Exxon Mobil*, 513 F. Supp. 3d at 736. While the Eighth Circuit reached a different result in *Wells Fargo & Co. v. United States*, 957 F.3d 840, 853-54 (8th Cir. 2020), that decision is contrary to binding Fifth Circuit precedent and should not be followed. *See, e.g.*, *Chemtech Royalty Assocs. v. United States*, 823 F.3d 282, 287, 289-90 (5th Cir. 2016) (looking solely to "cited authorities," and not to the taxpayer's conduct or subjective understanding, in analyzing whether a tax position had a "reasonable basis" under Section 6662).

§§ 1.6662-3(a), (c); 1.6662-4(a), (e), (f).. There is no genuine issue of fact that ExxonMobil satisfies both of these requirements.

*First*, for the reasons discussed above, ExxonMobil's purchase and change in accounting method positions satisfy the reasonable basis standard under Section 6662. (*See supra* at 16-19.)

*Second*, ExxonMobil adequately disclosed those positions to the IRS. Under applicable law, a return position is adequately disclosed if it is reported on, among other filings, the taxpayer's Uncertain Tax Positions Statement ("Schedule UTP") or disclosed at the beginning of the audit on the so-called 15-day letter.[41] For purposes of a defense to the substantial understatement penalty, a return position may also be disclosed on the taxpayer's Schedule M-3.[42] Here, ExxonMobil's purchase and change in accounting method positions were disclosed on multiple relevant ExxonMobil filings—specifically, they were disclosed on the 2010 and 2011 Schedule UTPs, 15-day letter for 2011, and 2010 and 2011 Schedule M-3s.[43] For these reasons, the substantial understatement and disregard of rules and regulations penalties were illegally assessed as to both ExxonMobil's purchase and change in accounting method tax positions.

---

[41] Treas. Reg. §§ 1.6662-3(c)(2); 1.6662-4(e), (f) (disclosure on Form 8275 or Form 8275-R); Rev. Proc. 94-69, 1994-2 C.B. 804 (disclosure on 15-day letter); IRS Ann. 2010-75, 2010-41 I.R.B. 428 at 17 (disclosing on a Schedule UTP is treated as filing a Form 8275 or Form 8275R).

[42] Treas. Reg. § 1.6662-4(e), (f); Rev. Proc. 2011-13, 2011-3 I.R.B. 318, § 4.02(3); Rev. Proc. 2012-15, 2012-I.R.B. 369, § 4.02(3).

[43] Addendum 1 identifies the specific disclosures that satisfy this defense.

### 3. Even if Section 6662 Imposed a Subjective Requirement for the Reasonable Basis Defense, ExxonMobil Also Meets that Standard

Even if the Court were to apply a subjective component to the reasonable basis defense, the negligence penalties are *still* erroneous because the undisputed evidence shows that ExxonMobil "*actually relied* on the relevant legal authorities that form the reasonable basis for its position[s]." *Wells Fargo*, 957 F.3d at 854 (emphasis added).

ExxonMobil's 2006 and 2007 Qatar and Malaysia protest submissions to the IRS, which predate the filing of ExxonMobil's 2010 and 2011 tax returns, cite the key authorities on which ExxonMobil relied for its tax positions on the purchase and change in accounting method issues.[44] ExxonMobil's responses to IRS Information Document Requests from the audit process also cite the key authorities supporting ExxonMobil's position that the change to purchase treatment for the Qatar and Malaysia transactions did not involve a question of timing, and therefore did not constitute a change in method of accounting.[45] Moreover, ExxonMobil's tax positions were memorialized in formal memoranda in 2011 and 2012 that detail the tax treatment and the bases for the tax reporting.[46] Thus, regardless of whether the reasonable basis

---

[44] ExxonMobil's protest submission cites *Anderson v. Helvering*, 310 U.S. 404 (1940), *Christie v. United States*, 237 U.S. 234 (1915), *Thomas v. Perkins*, 301 U.S. 655 (1937), and *Shamrock Oil & Gas Corp. v. Commissioner*, 346 F.2d 377 (5th Cir. 1965), and IRS Technical Advice Memorandum 199918002. (Ex. 22 (2006-2007 Qatar protest submission), App. 291-317; Ex. 23 (2006-2007 Malaysia protest submission), App. 318-56.)

[45] ExxonMobil's responses cite Treas. Reg. § 1.446-1(e)(2), which is the key regulation that makes clear a change in accounting method must involve a change in timing. (Ex. 25 (Aug. 1, 2013 IDR response), App. 360-66; Ex. 26 (Aug. 15, 2014 IDR 321-IE Response), App. 367-72.)

[46] *See* Ex. 20 (April 8, 2011 ExxonMobil memorandum regarding tax treatment of Qatar DFAs), App. 281-84; Ex. 21 (May 29, 2012 ExxonMobil memorandum regarding tax treatment of Malaysia PSCs), App. 285-90.

standard under Section 6662 is interpreted to include a subjective element, ExxonMobil also satisfies that standard. The negligence penalties were therefore erroneous.

#### 4. The Change in Accounting Method Penalties Were Illegally Assessed Because There Was No Change in Method of Accounting and ExxonMobil Satisfies the Substantial Authority Defense

The penalties related to ExxonMobil's change from mineral lease to purchase treatment are also erroneous for an additional reason: the change in treatment was not a change in method of accounting that required the IRS's consent in the first place—or at minimum, there is substantial authority for that position, which is a complete defense. *See* 26 U.S.C. § 6662(d)(2)(B)(i); Treas. Reg. §§ 1.6662-4 (a), (d)(3)(i). As a result, those penalties are erroneous *regardless* of whether ExxonMobil's tax position was adequately disclosed to the IRS.[47] (*See supra* at 20.)

The Treasury regulations provide that a change in method of accounting does not include the "adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(b). Under this standard, changing an item's treatment from deductible to nondeductible is not a change in method of accounting. *Id.* The plain language of the Treasury regulations thus confirms that when the issue presented is whether an item is included in income, there is no change in method of accounting requiring the IRS's consent. *See* 26 U.S.C. § 446(e) (requiring IRS consent only if the taxpayer is changing a method of accounting).[48]

---

[47] In the 2006-2009 Litigation, the Court did not address whether the substantial authority standard was satisfied because that was not a defense to Section 6676 penalties.

[48] The same conclusion is supported by longstanding case law. For example, in *Tate & Lyle, Inc. v. Commissioner*, the Tax Court considered whether a taxpayer's failure to report as income interest excludible from its income under a tax treaty presented a method of accounting issue. 103 T.C. 656, 668-69 (1994), *rev'd on other grounds*, 87 F.3d 99 (3d Cir. 1996). After
(….continued)

The same is true here. As the Fifth Circuit acknowledged in affirming this Court's ruling on the penalties issues, the difference between mineral lease and purchase treatment is not one of timing but rather whether certain payments are *ever* includable in income:

> Mineral leases and mineral sales receive different income-tax treatment. With mineral leases, the transferor's income from minerals is treated as ordinary taxable income. That is, a portion of the overall income from minerals is included only in the transferor's taxable income and excluded from the transferee's [i.e., ExxonMobil's] taxable income . . . .
>
> For mineral sales, the transferor realizes income only at the time of the sale. Income derived from the extraction of minerals is included in the transferee's [i.e., ExxonMobil's] taxable income, and only the transferee is entitled to depletion deductions.

*Exxon Mobil*, 43 F.4th at 428 (citations omitted). The Fifth Circuit recognized that the change between mineral lease to purchase treatment is whether income is *ever* includible in the transferee's income and not when the income is includible in the transferee's income. Thus, the Fifth Circuit decision strongly supports ExxonMobil's argument that there was no change in accounting method for which IRS approval was required. At a minimum, ExxonMobil satisfies the substantial authority defense because, as explained above, ExxonMobil has substantial authority that the correction to purchase treatment is not a change in accounting method. (*See supra* note 48.)

---

finding that a "method of accounting for income only determines *when an item is includable in income*" and "never comes into play if the item is *excluded from gross income*," the Tax Court held that the taxpayer's treatment was not a method of accounting because the interest was excluded from income by treaty. *Id.* at 669 (emphasis added). Similarly, in *Knight-Ridder Newspapers, Inc. v. United States*, the Eleventh Circuit found that a reserve was a method of accounting because it "did not determine whether or not a rebate would be deducted, but when that deduction would occur." 743 F.2d 781, 798 (11th Cir. 1984).

### III. ExxonMobil is Entitled to Summary Judgment on Its Claims for Interest

Finally, ExxonMobil is also entitled to a refund of interest that was erroneously assessed and collected by the IRS. While the parties have largely stipulated to the relevant issues,[49] there remains one disputed question of law that impacts the computation of the final amount owed to ExxonMobil: whether deposits that ExxonMobil made with the IRS under Section 6603 of the Tax Code for tax year 2012 (the "2012 Deposits") can be used to suspend underpayment interest for tax years 2010 and 2011. Under Fifth Circuit precedent, the answer is yes, and ExxonMobil is entitled to summary judgment on this issue.

Section 6603 allows taxpayers to make cash deposits to suspend the running of interest on potential tax underpayments before the tax is assessed. *See* Rev. Proc. 2005-18, § 2.01, 2005-1 C.B. 798. If the deposits are used to pay tax after it is assessed, Section 6603(b) suspends interest on the tax underpayments from the date when the deposits are made. *See also* Rev. Proc. 2005-18, § 8, 2005-1 C.B. 798. The IRS pays interest on Section 6603 deposits only if they are returned to the taxpayer. 26 U.S.C. § 6603(d)(1).

Here, there are no facts that are in dispute. ExxonMobil made the 2012 Deposits on September 9, 2009, October 22, 2009, June 14, 2010, June 21, 2010, and July 5, 2010.[50] In March 2017, ExxonMobil instructed the IRS to apply the 2012 Deposits as payments of its 2012 tax that the IRS proposed in a February 2017 notice of deficiency and later assessed.[51] That tax

---

[49] *See generally* Interest Stipulation, App. 68-77.

[50] Interest Stipulation ¶ 17, App. 74.

[51] Interest Stipulation ¶ 18, App. 74.

was due on March 15, 2013, which is when the IRS could first begin accruing interest on the unpaid tax.[52]

The 2012 Deposits could not suspend underpayment interest for tax year 2012 before March 15, 2013, and the IRS has not paid any interest to ExxonMobil on the 2012 Deposits before March 15, 2013.[53] Therefore, the 2012 Deposits may be used to suspend underpayment interest for tax years 2010 and 2011 for the period *before* March 15, 2013.

Under the "established use-of-money principle" applied by the Fifth Circuit, the IRS erroneously assessed underpayment interest against ExxonMobil before March 15, 2013, on 2010 and 2011 underpayment balances for periods of time when it had the free use of ExxonMobil's funds—the 2012 Deposits—in amounts equal to those underpayment balances. *Goldring v. United States*, 15 F.4th 639, 649 (5th Cir. 2021). As the Fifth Circuit has long recognized, "interest is assessed in order to compensate a creditor, here the government, for the period during which it was deprived of the use of the money." *Vick v. Phinney*, 414 F.2d 444, 448 (5th Cir. 1969). Because the government was not deprived of the use of its money here, ExxonMobil should not be charged interest. Instead, interest should be suspended for tax years 2010 and 2011 for the periods of time when the IRS has had the free use of ExxonMobil's 2012 Deposits.[54]

* * * * *

[52] Interest Stipulation ¶¶ 19, 20, App. 74-75.

[53] Interest Stipulation ¶ 21, App. 75.

[54] Undisputed evidence from ExxonMobil's expert on interest computations, David H. Boucher, identify the relevant Section 6603 Deposits and establish the relevant underpayment periods and applicable interest suspensions for tax years 2010 and 2011. (Ex. 9 (Boucher Report) ¶¶ 34-40, App. 129-32.) The tax impact of this issue is approximately $8.7 million. (*Id.* ¶ 40, App. 132.)

The remaining interest issues—including the application of credit elect transfers and interest netting and the payment of overpayment interest on any refund amounts that are owed to ExxonMobil—are not in dispute.[55] However, the final interest computations will depend on the Court's resolution of the tax and penalty refund issues described above, as well as the date of the subsequent refund payment.

## **CONCLUSION**

For the reasons described above, ExxonMobil respectfully requests that partial summary judgment be entered in its favor, and that the parties be directed to confer on final interest calculations within thirty (30) days of the Court's decision, after which a final judgment may be entered.

[55] *See* Interest Stipulation ¶¶ 7, 9-14, 23-26, App. 71-75.

# ADDENDUM 1

| Document | Description | Appendix Page(s) |
|---|---|---|
| ***2010 PURCHASE TRANSACTION DISCLOSURE EVIDENCE*** | | |
| **Qatar Development and Fiscal Agreements** | | |
| 2010 Form 1120, Uncertain Tax Position Statement (Schedule UTP) | *Statement 4, Schedule UTP, Part III* - Describing the Qatar purchase transactions and change in accounting method position and stating that "[t]he issue is whether the State of Qatar leased or sold the mineral property" | Ex. 32, App. 494 |
| 2010 Form 1120, Schedule M-3 for ExxonMobil Ras Gas Inc. (Ras Laffan Liquid Natural Gas Co ("RL1"); Ras Laffan Liquefied Natural Gas Company Ltd. (II) ("RL2"); Ras Laffan Liquified Natural Gas Company Ltd III ("RL3")) | *Schedule M-3, Part II, Line 10, Income (loss) from foreign partnerships, (b) Temporary Difference* – Includes interest expense deductions attributable to RL1, RL2, and RL3's purchase transactions | Ex. 34, App. 502-503 |
| | *Statement 183 to Schedule M-3, Part II, Line 10, (b) Temp Diff* – Separately stating Line 10 amount for RL1, RL2, and RL3[56] | Ex. 35, App. 506-509 |
| | *Statement 36 to Schedule M-3, Part II, Line 10, (b) Temp Diff* – Also separately stating Line 10 amount for RL1, RL2, and RL3 | Ex. 36, App. 512-519 |
| 2010 Form 1120, Schedule M-3 for ExxonMobil Petroleum & Chemical Holdings. Inc. (Qatar Liquified Gas Company Ltd. ("QG2")) | *Schedule M-3, Part II, Line 10, Income (loss) from foreign partnerships, (b) Temporary Difference* – Includes interest expense deductions attributable to QG2's purchase transactions | Ex. 34, App. 500-501 |
| | *Statement 56 to Schedule M-3, Part II, Line 10, (b) Temporary Difference* – Separately stating Line 10 amount for QG2 | Ex. 36, App. 520-523 |
| | *Statement 36 to Schedule M-3, Part II, Line 10, (b) Temporary Difference* – Also separately stating Line 10 amount for QG2 | Ex. 36, App. 512-519 |

[56] The interest expense attributable to the Qatar purchase transactions is included in the separately stated book-to-tax difference (*i.e.*, Part II, Line 10, (b) Temporary Difference) amount listed on each of the M-3 Statements referenced in this chart. *See* Ex. 6 (Declaration of William F. Rogers) ¶ 6, 92.

| Document | Description | Appendix Page(s) |
|---|---|---|
| ***2011 PURCHASE TRANSACTION DISCLOSURE EVIDENCE*** | | |
| **Qatar Development and Fiscal Agreements** | | |
| 2011 Form 1120, Uncertain Tax Position Statement (Schedule UTP) | *Statement 2, Schedule UTP, Part III* – Describing the Qatar purchase transactions and change in accounting method position and stating that "[t]he issue is whether the State of Qatar leased or sold the mineral property" | Ex. 33, App. 497 |
| 2011 Form 1120, Schedule M-3, for ExxonMobil Ras Gas Inc. (RL1, RL2, RL3) | *Schedule M-3, Part II, Line 10, Income (loss) from foreign partnerships, (b) Temporary Difference* – Includes interest expense deductions attributable to RL1, RL2, and RL3's purchase transactions | Ex. 37, App. 530-531 |
| | *Statement 170 to Schedule M-3, Part II, Line 10, (b) Temporary Difference* – Separately stating Line 10 amount for RL1, RL2, and RL3 | Ex. 38, App. 536-539 |
| | *Statement 38 to Schedule M-3, Part II, Line 10, (b) Temporary Difference* – Also separately stating Line 10 amount for RL1, RL2, and RL3 | Ex. 39, App. 542-549 |
| 2011 Form 1120, Schedule M-3 for ExxonMobil Petroleum & Chemical Holdings. Inc. (QG2) | *Schedule M-3, Part II, Line 10, Income (loss) from foreign partnerships, (b) Temporary Difference* – Includes interest expense deductions attributable to QG2's purchase transactions | Ex. 37, App. 526-527 |
| | *Statement 55 to Schedule M-3, Part II, Line 10, (b) Temporary Difference*– Separately stating Line 10 amount for QG2 | Ex. 39, App. 550-553 |
| | *Statement 38 to Schedule M-3, Part II, Line 10, (b) Temporary Difference*– Also separately stating Line 10 amount for QG2 | Ex. 39, App. 542-549 |

| Document | Description | Appendix Page(s) |
|---|---|---|
| **Malaysia Production Sharing Contracts** | | |
| 2011 15-Day Letter Furnished under Rev. Proc. 94-69 dated March 6, 2013 | *XIII. Form 1120, Line 2 [Depletion Expense]; Line 18 [Interest Expense] for ExxonMobil Exploration & Production Malaysia Inc.* – Describing the 2011 Malaysia purchase transactions and change in accounting method position stating that "Petronas effectively sold mineral property interests to [ExxonMobil] in return for a right to receive contingent payments" | Ex. 24, App. 359 |
| 2011 Form 1120, Schedule M-3 for ExxonMobil Exploration and Production Malaysia Inc. | *Schedule M-3, Part III, Line 8, Interest Expense (attach Form 8916-A), (b) Temporary Difference* – Includes interest expense deductions attributable to Malaysia purchase transactions | Ex. 37, App. 528-529 |
| 2011 Form 1120, Form 8916-A, Supplemental Attachment to Schedule M-3 for ExxonMobil Exploration and Production Malaysia Inc. | *Part III, Line 4, Other interest expense, (b) Temporary Difference* – Includes interest expense deductions attributable to Malaysia purchase transactions[57] | Ex. 37, App. 532-533 |

[57] The interest expense attributable to the Malaysia purchase transactions is included in the separately stated book-to-tax difference (*i.e.,* Part III, Line 4, Other interest expense, (b) Temporary Difference) amount listed on Form 8916-A, Supplemental Attachment to Schedule M-3 referenced in this Adequate Disclosure Evidence chart. (*See* Ex. 6 (Declaration of William F. Rogers) ¶ 7, App. 92-93.)

Dated: May 16, 2025

DAVIS POLK & WARDWELL LLP

*/s/ James P. Rouhandeh*

James P. Rouhandeh*
rouhandeh@davispolk.com
Antonio J. Perez-Marques*
antonio.perez@davispolk.com
Lara Samet Buchwald*
lara.buchwald@davispolk.com
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Sean Stefanik*
sean.stefanik@davispolk.com
1050 17th St. NW
Washington, DC 20036
(202) 962-7000
* Admitted *pro hac vice*

HOLLAND & KNIGHT LLP

Emily A. Parker
State Bar No. 15482500
emily.parker@hklaw.com
Mary A. McNulty
State Bar No. 13839680
mary.mcnulty@hklaw.com
Leonora S. Meyercord
State Bar No. 24074711
lee.meyercord@hklaw.com
Dina W. McKenney
State Bar No. 24092809
dina.mckenney@hklaw.com
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 964-9501 (Fax)

*Attorneys for Plaintiff*
*Exxon Mobil Corporation*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was filed and served electronically through ECF on May 16, 2025, which gave notice to all counsel of record.

*/s/ James P. Rouhandeh*
James P. Rouhandeh