**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| EXXON MOBIL CORPORATION,<br><br>Plaintiff,<br><br>- against -<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL ACTION NO. 3:22-CV-00515-N |

**PLAINTIFF EXXON MOBIL CORPORATION'S REPLY**
**IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON REFUND COMPUTATIONS, PENALTIES, AND INTEREST**

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ....................1

ARGUMENT ....................3

I. ExxonMobil Is Entitled to Summary Judgment on Its Claim for a Refund of Taxes ....................3

A. The Residual Profit Share Payments Qualify as Payments for the Use of Capital Under Section 707(c) ....................3

1. The Residual Profit Share Payments Are Payments to a Partner ....................5

2. The Residual Profit Share Payments Are Payments for the Use of Capital ....................7

3. The Residual Profit Share Payments Are Determined Without Regard to the Income of the Partnership ....................8

B. Because the Residual Profit Share Payments Qualify Under Section 707(c), All of the Interest Expense Must be Allocated to ExxonMobil ....................11

II. ExxonMobil Is Entitled to Summary Judgment on Its Claim for a Refund of Penalties ....................14

A. The AKG Production Payment Penalties Were Illegally Assessed and Should Be Refunded ....................14

B. The Purchase Transaction and Change in Accounting Method Penalties Were Illegally Assessed and Should Be Refunded ....................17

1. The Negligence Penalties Are Unlawful Because ExxonMobil Satisfies the Reasonable Basis Defense, Including As a Consequence of This Court's Prior Decisions ....................17

2. The Substantial Understatement and Disregard of Rules and Regulations Penalties Were Illegally Assessed Because ExxonMobil Satisfies the Reasonable Basis Plus Adequate Disclosure Defense ....................20

3. The Change in Accounting Method Penalties Were Illegally Assessed Because, At a Minimum, ExxonMobil Satisfies the Substantial Authority Defense ....................23

III. ExxonMobil Is Entitled to Summary Judgment on Its Claims for Interest ....................24

CONCLUSION ....................25

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Anderson v. Helvering*
310 U.S. 404 (1940) .......... 19

*Boynton v. Comm'r*,
649 F.2d 1168 (5th Cir. 1981) .......... 13

*Burditt v. Comm'r*,
77 T.C.M. (CCH) 1767 (1999) .......... 15-16

*Chemtech Royalty Assocs., L.P. v. United States*,
823 F.3d 282 (5th Cir. 2016) .......... 16, 18

*Christie v. United States*,
436 F.2d 1216 (5th Cir. 1971) .......... 19

*Clark v. Comm'r*,
44 T.C.M. (CCH) 492 (1982) .......... 10

*Comm'r v. Culbertson*,
337 U.S. 733 (1949) .......... 5

*Dillon Tr. Co. v. United States*,
162 Fed. Cl. 708 (2022) .......... 25

*Exxon Mobil Corp. v. United States*,
513 F. Supp. 3d 734 (N.D. Tex. 2021), *aff'd*, 43 F.4th 424 (5th Cir. 2022) .......... 17, 20

*Exxon Mobil Corp. v. United States*,
43 F.4th 424 (5th Cir. 2022) .......... 18

*Fahey v. Comm'r*,
38 T.C.M. (CCH) 62 (1979) .......... 6

*Foster v. United States*,
221 F. Supp. 291 (S.D.N.Y. 1963) .......... 5

*Goldring v. United States*,
15 F.4th 639 (5th Cir. 2021) .......... 25

*Mangham v. Comm'r*,
40 T.C.M. (CCH) 788 (1980) .......... 6

*Manning v. Seeley Tube & Box Co.*,
338 U.S. 561 (1950) .......... 24

*Principal Life Ins. Co. v. United States*,
95 Fed. Cl. 786 (2010) ............................................................ 25

*Purple Heart Patient Ctr., Inc. v. Comm'r*,
121 T.C.M. (CCH) 1260 (2021) ............................................................ 16

*Vick v. Phinney*,
414 F.2d 444 (5th Cir. 1969) ............................................................ 25

*Wells Fargo & Co. v. United States*,
957 F.3d 840 (8th Cir. 2020) ............................................................ 18, 19

STATUTES & RULES

26 U.S.C. § 199A ............................................................ iii, iv

26 U.S.C. § 707(c) ............................................................ *passim*

26 U.S.C. § 6662 ............................................................ *passim*

26 U.S.C. § 6676 ............................................................ 17, 19, 20

Treas. Reg. § 1.446-1(e)(2) ............................................................ 20, 23

Treas. Reg. § 1.6662-3 ............................................................ 14, 15, 17

Treas. Reg. § 1.6662-4 ............................................................ 15, 16, 22

Treas. Reg. § 1.707-1(c) ............................................................ 5, 8, 15

Treas. Reg. § 1.707-4(a) ............................................................ 7, 8, 9

OTHER AUTHORITIES

I.R.S. Chief Couns. Adv. 200215053 (Apr. 12, 2002) ............................................................ 6

I.R.S. Gen. Couns. Mem. 38,670 (Mar. 31, 1981) ............................................................ 9

I.R.S. Priv. Ltr. Rul. 7806068 (Nov. 14, 1977) ............................................................ 10

I.R.S. Priv. Ltr. Rul. 7939005 (May 30, 1979) ............................................................ 6

I.R.S. Priv. Ltr. Rul. 9340036 (July 6, 1993) ............................................................ 9

I.R.S. Priv. Ltr. Rul. 199915010 (Apr. 16, 1999) ............................................................ 9

William S. McKee et al., *Federal Taxation of Partnerships and Partners* (5th ed. 2025) ........... 8

Philip F. Postlewaite & David L. Cameron, *Twisting Slowly in the Wind: Guaranteed Payments After the Tax Reform Act of 1984*, 40 Tax Law. 649 (1987) ............................................................ 8

Rev. Proc. 60-17, 1960-2 C.B. 942 § 2.01(1) ............................................................ 24

Rev. Proc. 94-69, 1994-2 C.B. 804 § 3.02 ............................................................ 21

Rev. Proc. 97-27, 1997-1 C.B. 680 ........ 23

Rev. Proc. 2005-18, 2005-13 I.R.B. 798 ........ 24

Rev. Proc. 2011-13, 2011-3 I.R.B. 318 ........ 16, 21, 22

Rev. Proc. 2012-15, 2012-7 I.R.B. 369 ........ 16, 21, 22

Rev. Rul. 67-158, 1967-1 C.B. 188 ........ 11

Rev. Rul. 90-38, 1990-1 C.B. 57 ........ 23

S. Rep. No. 83-1622 (1954) ........ 10

S. Rep. No. 97-494 (1982) ........ 22

Arthur B. Willis et al., *Partnership Taxation* (9th ed. 2024) ........ 6

Plaintiff Exxon Mobil Corporation ("ExxonMobil") respectfully submits this reply in further support of its motion for partial summary judgment on refund computations, penalties, and interest (ECF No. 205) (the "Motion").[1]

**PRELIMINARY STATEMENT**

The only remaining questions in this case are the amount of the tax refund and the validity of the penalties. On those issues, there are no remaining disputes of fact, and ExxonMobil is entitled to summary judgment in its favor.

***First***, as to the tax refund calculation, the only disputed issue is a legal one: whether the Residual Profit Share payments qualify as payments for the use of capital under Section 707(c). Under the plain language of the statute, they do. The Residual Profit Share payments are (i) made to a partner (the State of Qatar), (ii) for the use of capital (the minerals that Qatar contributed), and (iii) determined without regard to the partnership's income (because they are calculated based on the volume and value of the extracted mineral rather than the taxable income of the partnership). The statute requires nothing more. Because the Residual Profit Share payments are Section 707(c) payments, they do not result in an allocation of any partnership items, like interest expense, to the State of Qatar. Thus, all of AKG's interest expense must be allocated to ExxonMobil. The undisputed facts show that ExxonMobil is entitled to a tax refund for the AKG issue of $130 million for 2010 and $144 million for 2011.

In opposition, Defendant argues that ExxonMobil's victory on the merits and ExxonMobil's position on the amount of the refund are in conflict. No such conflict exists here. That is because the question of whether the State of Qatar shared in AKG's profits (and AKG is

---

[1] All capitalized terms used but not defined herein have the meanings ascribed to them in ExxonMobil's Memorandum of Law in Support of the Motion (ECF No. 206, "Mem."). "Opp." or "Opposition" refers to Defendant's Brief in Opposition to the Motion (ECF No. 212).

therefore a partnership) is a separate legal test from whether the State of Qatar's Residual Profit Share is determined without regard to the partnership's income (and therefore qualifies as a Section 707(c) payment). In advancing its argument, Defendant conflates these two separate tests. But the law is clear that a Section 707(c) payment cannot exist *unless there is a partnership*. In other words, these separate legal tests are not even in tension with one another—let alone in conflict—because one of the threshold requirements under Section 707(c) is whether a partnership exists.

Doubling down on its meritless position, Defendant also acknowledges that the position it advances—*that ExxonMobil should receive no tax refund at all*—would all but nullify the Court's post-trial decision. It even goes so far as to suggest that the Court may reconsider its prior findings to reach that result. But that request is not only meritless, it is improper.

***Second***, as to penalties, the Court has already ruled that ExxonMobil's tax position on the AKG production payment was correct. Defendant's new litigation position—that the partnership's *interest expense allocation* should be penalized—is baseless. On the purchase treatment and change in accounting method penalties, Defendant cannot evade this Court's prior decision (affirmed on appeal) that ExxonMobil's tax position had a reasonable basis. And ExxonMobil also satisfies multiple, independently sufficient defenses. The undisputed facts show that ExxonMobil is entitled to a refund of $51 million for the AKG production payment penalties for 2010 and 2011 and $131 million for the penalties related to the DFAs and PSCs for 2010 and 2011.

***Finally***, as to interest, this is a largely arithmetic and uncontested calculation. On the only disputed issue, which relates to the suspension of interest for periods when the IRS had the free use of ExxonMobil's money, Fifth Circuit law requires a ruling in ExxonMobil's favor.[2]

**ARGUMENT**

## I. ExxonMobil Is Entitled to Summary Judgment on Its Claim for a Refund of Taxes

Defendant disputes no facts that bear on the amount of the tax refund owed to ExxonMobil. The sole remaining legal question is whether the Residual Profit Share payments qualify as payments for the use of capital under Section 707(c) of the Tax Code (i.e., "guaranteed payments"). If they do, then Defendant *concedes* that all of the AKG production payment interest expense must be allocated to ExxonMobil, as ExxonMobil is the only partner that receives a distributive share.[3] Because the Residual Profit Share payments meet the requirements of Section 707(c), the Court should rule that all of the production payment interest expense is allocated to ExxonMobil.[4]

### A. The Residual Profit Share Payments Qualify as Payments for the Use of Capital Under Section 707(c)

In its opening brief, ExxonMobil established that the Residual Profit Share payments satisfy all three prongs of Section 707(c): the payments are (i) made to a partner, (ii) for the use of capital, and (iii) determined without regard to the income of the partnership. (*See* Mem. at

---

[2] For the Court's convenience, Addendum 1 includes the calculations that underlie the numbers set forth in ExxonMobil's Motion and in its proposed order.

[3] *See, e.g.*, Opp. at 18 ("[T]he government agrees that, as a matter of law, a guaranteed payment does not carry [] a distributive share of partnership items . . . .").

[4] Defendant does not dispute that the interest expense allocated to ExxonMobil is apportioned among all of ExxonMobil's U.S. and foreign income sources, as ExxonMobil established in its opening brief. (*See* Mem. at 10.) ExxonMobil is therefore entitled to summary judgment on that issue as well.

7-9.) Thus, the tax treatment to which the parties agreed in the ARDPSA is correct and mandated by federal tax law.[5]

Defendant's arguments to the contrary rest on an erroneous assumption: that a partner's *share of profits* and a payment under *Section 707(c)* are mutually exclusive. According to Defendant, the Court's opinion that the Residual Profit Share was a "profit share" precludes a supposed "attempt to recharacterize it" now under Section 707(c).[6] (Opp. at 6.) But none of this is true. The question of whether AKG is a partnership, and the question of how interest expense is allocated *between* the partners, are two separate analyses that are subject to different legal tests. At trial, the Court applied well-established Supreme Court precedent to find that ExxonMobil and the State of Qatar engaged in a joint business venture and shared in profits and

[5] Defendant asserts that the partners' treatment of the Residual Profit Share in Article 39.14 of the ARDPSA is "irrelevant." (Opp. at 7.) That misses the point. Nearly 20 years ago, the parties agreed that those payments qualified under Section 707(c). Since then, ExxonMobil has consistently deducted interest expense in accordance with that agreement—including in tax years 2006, 2007, 2008, and 2009, *when the IRS failed to challenge that tax treatment*. (*See* Mem. at 6-7.) The relevant point is *not* that the ARDPSA itself is dispositive; it is that the parties—after a lengthy negotiation that included tax planning components—reached the correct result, and that ExxonMobil's position on this issue (unlike that of the IRS) has been consistent ever since.

[6] This assumption is also the basis for Defendant's equally erroneous assertion that ExxonMobil is now advancing the "*opposite*" argument that it did at trial—i.e., that the State of Qatar "*did not* share profits"—to support its argument on Section 707(c). (Opp. at 6-7 (emphasis added).) This argument is a meritless distraction. To be clear, the Court correctly concluded that the State of Qatar shares in the *profits* of the partnership. The Residual Profit Share payments *also* qualify as payments for the use of capital under Section 707(c) because (among other things) they are determined without regard to the *income* of the partnership. (*See infra* at 8-11.) Defendant's speculation that ExxonMobil sought to bifurcate this case because its "arguments . . . would look absurd side-by-side in a single proceeding" (Opp. at 7) is not only wrong for that reason—it is also baseless because, as this Court correctly concluded, bifurcation was warranted in the interest of efficiency, just as it was in the 2006-2009 Litigation. (*See* Bifurcation Order (ECF No. 50) at 2-3; Mem. at 11.)

losses.[7] The Court is now presented with a different question—one that only arises *after* a partnership has been found. The question of whether the Residual Profit Share payments are payments for the use of capital under Section 707(c) depends on whether the payments satisfy the requirements of that specific section of the Tax Code. There is no support for Defendant's threshold argument that a profit share categorically cannot qualify under Section 707(c).[8] Indeed, Defendant's position erroneously conflates "*profits*" (in the context of *Culbertson* and the partnership test) and "*income*" (under Section 707(c)). As explained below, those terms mean different things, and a payment can be *both* a share of profit share for purposes of establishing a partnership *and* a payment for the use of capital under Section 707(c).[9]

**1. The Residual Profit Share Payments Are Payments to a Partner**

The first prong of Section 707(c) is straightforward. The Court already concluded that AKG is a partnership under federal tax law and that ExxonMobil and the State of Qatar are partners.[10] And there is no dispute that the Residual Profit Share payments were, in fact, paid to

---

[7] Post-Trial Decision at 16 ¶ 4 (citing *Comm'r v. Culbertson*, 337 U.S. 733, 741 (1949)), App. 33.

[8] Defendant relies on *Foster v. United States*, 221 F. Supp. 291, 294 (S.D.N.Y. 1963) for the supposed juxtaposition between "profits or anticipated profits" and a "guaranteed payment." (Opp. at 5.) But the court's reference to profits was made when analyzing a tax year that preceded the enactment of Section 707(c). When analyzing tax years subject to Section 707(c), the court applied the "touchstone for determining 'guaranteed payments,'" which "is whether they are payable without regard to partnership income." *Foster*, 221 F. Supp. at 295.

[9] *See, e.g.*, Treas. Reg. § 1.707-1(c) (providing that "[g]uaranteed payments do not constitute an interest in partnership profits for purposes of sections 706(b)(3), 707(b), and 708(b)" (none of which apply here), which establishes that they are treated as an interest in profits for all other purposes).

[10] Post-Trial Decision at 15-16 ¶ 2, App. 32-33 ("First, Al Khaleej Gas is a partnership under federal tax law because ExxonMobil and the State of Qatar engaged in a joint business venture and shared in the profits and losses of that venture.").

the State of Qatar.[11] Thus, the Residual Profit Share payments are made "to a partner" within the meaning of Section 707(c). (*See* Mem. at 7.)

Defendant does not dispute the *fact* that the Residual Profit Share payments are made "to a partner," which is all that is required for this first prong. 26 U.S.C. § 707(c). Instead, Defendant tries to avoid the plain meaning of that statutory language by advancing unrelated and irrelevant arguments. *First*, Defendant asserts that "ExxonMobil's reliance on Qatar's partner status undermines, rather than supports, its position." (Opp. at 9.) That is nonsensical: a Section 707(c) payment, by definition, can be made only to a "partner" and thus *requires* the existence of a partnership.[12] *Second*, Defendant claims that there is "no authority" that treats a party as a partner where, as here, that party receives *only* a Section 707(c) payment. (*Id.*) That is not true,[13] nor does it provide a basis to sidestep the plain language of the statute.

---

[11] *See, e.g.*, Post-Trial Decision at 20-21 ¶ 16, App. 37-38; Ex. 54 (statements of petroleum cost reflecting Residual Profit Share payments to the State of Qatar), App. 861-965; PX-604 (Nov. 3, 2023 Plastino Expert Report) at 96 (table showing Residual Profit Share payments made to the State of Qatar), App. 104.

[12] *See, e.g.*, Arthur B. Willis et al., P'ship Tax'n ¶ 11.03[2][a], n.112 (9th ed. 2024) ("Of course, a guaranteed payment can only arise in connection with a payment to a partner. If the recipient is not a partner, the application of § 707(c) is irrelevant."); I.R.S. Chief Couns. Adv. 200215053 (Apr. 12, 2002), 2002 WL 542210 (in concluding that payments to an of counsel attorney in a law firm were not guaranteed payments because the attorney was not a partner, the IRS considered many factors, including the attorney's interest in profits, losses, and capital and his managerial rights).

[13] For example, in *Mangham v. Commissioner*, 40 T.C.M. (CCH) 788 (1980), the court concluded that the only payments to a partner were Section 707(c) payments, and it found that the partner did not receive a distributive share. *See also, e.g.*, *Fahey v. Comm'r*, 38 T.C.M. (CCH) 62 (1979) (partner received only monthly guaranteed payments and no share of partnership's net loss); I.R.S. Priv. Ltr. Rul. 7939005 (May 30, 1979) (partner received only monthly guaranteed payments and "was not to receive a distributive share of partnership income").

### 2. The Residual Profit Share Payments Are Payments for the Use of Capital

The second prong is satisfied because the Residual Profit Share payments are payments "for . . . the use of capital." 26 U.S.C. § 707(c). (*See* Mem. at 7.) Defendant does not dispute the Court's findings that "the State of Qatar contributed rights to a significant volume of known minerals," or that those contributions "are treated as capital contributions to the Al Khaleej Gas partnership under federal tax law."[14] Instead, Defendant argues that the payments were not made for the partnership's use of those minerals because the Court "described the Residual Profit Share as a share of AKG's profits." (Opp. at 10.) But again, this erroneously assumes (with no support) that a partner's interest in profits cannot *also* be a payment for the use of capital.

Defendant's only other response is to argue that ExxonMobil's position is "internally inconsistent" because ExxonMobil's contributions to AKG are "materially similar" to those of Qatar, yet the payments that ExxonMobil receives from AKG are not Section 707(c) payments. (Opp. at 10.) But ExxonMobil's contributions to AKG were different in kind from the State of Qatar's contributions, and the payments that ExxonMobil receives from AKG are different from the Residual Profit Share payments. *First*, ExxonMobil contributed cash to construct the facilities (for which it is reimbursed through cost recovery payments), and those payments are treated as a *return of* capital—not payments *for the use of* capital—under the Treasury regulations implementing Section 707(c).[15] *Second*, whereas the Residual Profit Share payments are determined based on the value of the capital that the State of Qatar contributed (the

[14] Post-Trial Decision at 19 ¶ 12, App. 36.

[15] *See* Treas. Reg. § 1.707-4(a)(1)(i) ("For this purpose, one or more payments are not made for the use of a partner's capital if the payments are designed to liquidate all or part of the partner's interest in property contributed to the partnership rather than to provide the partner with a return on an investment in the partnership.").

minerals), ExxonMobil's Net Profits Interest payments are not tied to the value of the capital that *it* contributed to the partnership: cash to construct the facilities and know-how.[16]

### 3. The Residual Profit Share Payments Are Determined Without Regard to the Income of the Partnership

ExxonMobil also satisfies the third prong—that the Residual Profit Share payments are determined "without regard to the income of the partnership." 26 U.S.C. § 707(c). "Income" in Section 707(c) does not mean "profits" and does not mean (as Defendant asserts without any support) the "total income of a business." (Opp. at 12.) Rather, the term "income" means "taxable income."[17] This interpretation is consistent with the purpose of Section 707(c), which was enacted to address circumstances in which a Section 707(c) payment exceeded taxable income for a particular year.[18]

As ExxonMobil established in its opening brief, the Residual Profit Share payments are calculated based on the volume and value of the extracted mineral and are not based on taxable income. As volume and/or price increases, the Residual Profit Share increases, even if AKG's taxable income remains steady. (*See* Mem. at 8-9; *infra* at 11 & n.24.) Moreover, because cost

[16] While ExxonMobil's Retained Net Profits Interest is also calculated by reference to the fair market value of the mineral contributed by the State of Qatar, ExxonMobil did not contribute the mineral, so the Retained Net Profits Interest is not a payment for the use of ExxonMobil's capital.

[17] *See, e.g.*, Treas. Reg. § 1.707-1(c), Exs. 3 and 4 (a payment determined by reference to the partnership's "taxable income" is not a Section 707(c) payment); Treas. Reg. § 1.707-4(a)(4), Ex. 1 (a payment determined by reference to the partnership's "net taxable income" is not a Section 707(c) payment).

[18] *See* Philip F. Postlewaite & David L. Cameron, *Twisting Slowly in the Wind: Guaranteed Payments After the Tax Reform Act of 1984*, 40 Tax Law. 649, 674 n.127 & accompanying text (1987); William S. McKee et al., Fed. Tax'n P'ships & Partners ¶ 14.03[1][a] (5th ed. 2025) (interpreting "determined without regard to the income of the partnership" to mean "without regard to the taxable income of the partnership" produces "results more consistent with the congressional purpose").

recovery is capped at 40%, Profit Petroleum—the starting point for calculating the Residual Profit Share—is also divorced from taxable income. (*Id.* at 7-9.) This conclusion is further supported by the fact that the State of Qatar can and did receive a Residual Profit Share payment even when AKG has no profits or net income. (*Id.* at 8)

Defendant tries to argue that the Residual Profit Share *is* determined with regard to "income," but its arguments mischaracterize the facts and misapply the law.

*First*, Defendant argues that the Residual Profit Share payments do not qualify under Section 707(c) because the amount of those payments varies over time, and therefore the payments are not "fixed and determinable." (Opp. at 11-12.) But Section 707(c) includes no such requirement that the payments be "fixed and determinable," and in any event the example in the Treasury regulations confirms that a payment may qualify under Section 707(c) where the amount is not fixed but the *computation* of the payment is fixed.[19] This principle is confirmed by IRS rulings, which treat payments based on a fixed formula as Section 707(c) payments even when components in the formula vary.[20] Defendant does not (and cannot) dispute that the *computation* of the Residual Profit Share is fixed.

---

[19] Example 1 in the Treasury regulations, on which Defendant relies (Opp. at 11-12), proves this point. *See* Treas. Reg. § 1.707-4(a)(4), Ex. 1. The example involves a Section 707(c) payment for the use of capital that equals 10% of the fair market value of the partner's capital contribution in each of three consecutive years. This shows that a payment for the use of capital does not need to be a fixed amount, as a payment based on the fair market value of the contributed capital may vary—instead, it is the *formula* that remains fixed. Structuring payments for the use of capital based on a formula makes good business sense when the value of the contributed capital is expected to fluctuate or the amount of unreturned capital will change.

[20] *See, e.g.*, I.R.S. Priv. Ltr. Rul. 199915010 (Apr. 16, 1999) (monthly payments based on partner's unreturned capital amount, which could change, were guaranteed payments); I.R.S. Priv. Ltr. Rul. 9340036 (July 6, 1993) (annual payments based on partner's unreturned capital amount, which could change, were guaranteed payments); I.R.S. Gen. Couns. Mem. 38,670 (Mar. 31, 1981) (a percentage of gross rentals may be a guaranteed payment because the calculation is fixed, but the amount could vary if gross rentals change).

Defendant relies on the legislative history for interpreting an "archetypical" payment as being fixed in amount. That mischaracterizes the authorities. The Treasury regulations—which are of greater weight and more archetypical than legislative history—directly rebut this argument by including an example of a Section 707(c) payment where the amount is not fixed. (*See supra* at 9 & n.19.) And the legislative history on which Defendant relies all pertains to payments *for services*—not, as here, payments for the use of capital. (*See* Opp. at 11 (citing S. Rep. No. 83-1622, pt. 2, at 5029 (1954)).) While it is entirely reasonable that payments to a partner for routine services may be set at a fixed amount, even payments for services are respected under Section 707(c) where the amount varies over time.[21]

*Second*, Defendant argues that the Residual Profit Share does not qualify under Section 707(c) because it is a "variable undivided percentage interest in [] the Net Profits Interest," and the Net Profits Interest "represents the partners' shares of AKG revenues." (Opp. at 12 (citation and quotations omitted).) But that does not establish that the Residual Profit Share is determined with regard to income.[22] As explained above, "income" means "taxable income," not revenues, and the Residual Profit Share is not determined by reference to AKG's taxable income. (*See supra* at 8-9.)

*Third*, Defendant argues that the 40% cap on ExxonMobil's cost recovery is irrelevant because unrecovered costs carry over into the next quarter. (Opp. at 14-15.) But taxes are

---

[21] *See, e.g.*, *Clark v. Comm'r*, 44 T.C.M. (CCH) 492 (1982) (monthly payments based on monthly fixed living expenses, which could and did change, were guaranteed payments); I.R.S. Priv. Ltr. Rul. 7806068 (Nov. 14, 1977) (management fee payment based on percentage of total amount contributed by all partners was guaranteed payment).

[22] The fact that there is "volatility in the return profile" (Opp. at 13) is irrelevant. As discussed above, Section 707(c) does not require that the amount be constant or fixed. (*See supra* at 9.)

determined annually, and the purpose of Section 707(c) was to address situations in which a guaranteed payment exceeded taxable income for a particular year. (*See supra* at 8 & n.18.) Thus, it is irrelevant what happens in a subsequent year as a result of cost recovery carryover. On an annual basis, the cost recovery cap shows that Qatar may receive—and has received—Residual Profit Share payments even when AKG has no net profits or net income.

*Finally*, Defendant's conclusory assertion that a "method to determine how to share partnership profits or net income cannot, by definition, result in a guaranteed payment" (Opp. at 17) fails for all of these same reasons. In particular, that argument assumes that "without regard to [] *income*" in Section 707(c) means "without regard to *profits*," but that is not the case.[23] Defendant's further argument that the Residual Profit Share cannot increase even if AKG's income remains the same (Opp. at 17) fails for a similar reason—it ignores the impact of costs and interprets "income" to mean revenue. Because income means "taxable income," if costs increase commensurate with revenue, AKG's taxable income could remain the same, but the Residual Profit Share would increase due to the cost recovery cap.[24]

### B. Because the Residual Profit Share Payments Qualify Under Section 707(c), All of the Interest Expense Must be Allocated to ExxonMobil

Defendant does not dispute that if the Residual Profit Share payments qualify under Section 707(c), as explained above, then all of the production payment interest expense must be

[23] Defendant's citation to Revenue Ruling 67-158, 1967-1 C.B. 188 (Opp. at 17) underscores that Defendant's interpretation of "income" in this case is wrong. In the ruling, the partner's payments were determined by the foreign branch's *net* profits and were therefore not payments under Section 707(c). Here, the Residual Profit Share is not a share of net profits due to the cost recovery cap and therefore may qualify under Section 707(c).

[24] For example, if AKG's revenues increase from $100 to $200 and costs increase from $40 to $140, AKG's net taxable income remains $60 but the Residual Profit Share will increase due to the 40% cost recovery cap.

allocated to ExxonMobil. In fact, Defendant (i) *concedes* that "a guaranteed payment does not carry [] a distributive share of partnership items" (Opp. at 18), and (ii) *does not dispute* that the State of Qatar does not receive any other amounts in its capacity as a partner that would carry a distributive share. (*See* Mem. at 9.)

Defendant argues that because the Residual Profit Share is not a Section 707(c) payment, the "interest expense must be allocated to Qatar under Section 704(b)." (Opp. at 18.) Thus, Defendant concedes that Section 704(b) may apply only if the Residual Profit Share does *not* meet the requirements of Section 707(c). For that reason, the Court need not address the Section 704(b) issue if it rules in ExxonMobil's favor and concludes that the Residual Profit Share payments qualify under Section 707(c).

Even if the Court were to conclude that the Residual Profit Share payments do not qualify under Section 707(c), Defendant's argument—that all of the interest expense should then be allocated *to the State of Qatar* because it alone "bears the economic burden of that cost" (Opp. at 18)—is wrong and contrary to the Court's merits ruling. The Court already determined that the production payment "was carved out mineral property *held by the partnership* between ExxonMobil and the State of Qatar," and that it "is an economic interest that burdens *the partnership's* mineral property."[25] And the Court already rejected Defendant's argument that the production payment should be viewed in isolation as if it were paid only from the State of Qatar's share of revenues.[26] AKG pays the production payment from all the cash flows

[25] Post-Trial Decision at 15-16 ¶ 2, App. 32-33; 26-28 ¶¶ 29-33, App. 43-45 (emphases added).

[26] *See, e.g.*, Post-Trial Decision at 28 ¶ 34, App. 45 (rejecting Defendant's argument that the production payment should be disregarded and collapsed with the Residual Profit Share into a single royalty); *id.* at 31 ¶ 42, App. 48 (finding that the production payments "were indisputably real payments to the State of Qatar that formed an integral part of that transaction"); (….continued)

generated by *both partners'* capital contributions.[27] There are quarters in which ExxonMobil had negative cash flows, but AKG still made the production payments.[28] Thus, ExxonMobil shared in the economic burden of the production payments.[29] There is no basis to allocate all of the interest expense to the State of Qatar.

* * *

When the Residual Profit Share payments are treated as Section 707(c) payments, as mandated by federal law, the interest expense is allocated to ExxonMobil, and the amount of the AKG production payment tax refund is undisputed: ExxonMobil is entitled to a refund of $129,814,944 for 2010 and $144,147,949 for 2011.

---

*id.* at 37 ¶ 53, App. 54 (concluding that "the production payment was indisputably part and parcel of a larger 'bundle of provisions' in the ARDPSA"); *id.* at 38 ¶ 56, App. 55 (reasoning that an analysis of "the production payment in isolation . . . is an inquiry that is not supported by legal authority").

[27] "The production payments did not depend on, and were not part of, the profits of the partnership," but instead were "based solely on the value of natural gas produced from the reservoirs, irrespective of whether the partnership generated positive net income." Post-Trial Decision at 12 ¶ 33, App. 29.

[28] For example, in the second quarter of 2007, ExxonMobil had [redacted], yet the production payment was still made. ExxonMobil's contributions to AKG included cash to develop the mineral rights. (*See supra* at 7.) During this period, AKG's expenditures—development and operating costs—were about [redacted] and its revenues were about [redacted], resulting in a [redacted]. (*See* PX-192 (SOPC for Q4 2007), App. 891.) AKG made a production payment of about [redacted], and the Residual Profit Share [redacted]. (*See* PX-604 (Nov. 3, 2023 Plastino Expert Report) at 96, App. 104.) ExxonMobil received about [redacted]). (*Id.* at 98, App. 105.) Because ExxonMobil's contributions to AKG funded the $[redacted] of expenditures but it only received [redacted], it had [redacted] for this period of [redacted].

[29] Because the production payment changed the partners' economics and must be respected as a separate interest under federal tax law, this case is unlike *Boynton v. Commissioner*, 649 F.2d 1168, 1174 (5th Cir. 1981) (Opp. at 19), where the court disregarded an amended loss allocation because it did not impact the partnership's overall distribution of profits and losses under the partners' original agreement.

## II. ExxonMobil Is Entitled to Summary Judgment on Its Claim for a Refund of Penalties

Defendant's Opposition makes clear that there is no genuine issue of fact that prevents ExxonMobil from receiving its refund of penalties. Defendant's continued refusal to refund those penalties disregards the Court's prior rulings and ignores and mischaracterizes the evidence and the arguments in ExxonMobil's opening brief.[30]

### A. The AKG Production Payment Penalties Were Illegally Assessed and Should Be Refunded

The AKG production payment penalties should be refunded because ExxonMobil's tax treatment of the production payment—including AKG's allocation of the interest expense to ExxonMobil—was correct as a matter of law. (Mem. at 5-9; *supra* at 11-13.) As a result, there were no understatements of tax on ExxonMobil's returns that could be penalized.

Defendant argues that *only one* of the three AKG production payment penalties assessed by the IRS (for a substantial understatement of tax) was lawful if—*and only if*—the Court were to conclude that some of the interest expense should be allocated to the State of Qatar.[31] (Opp. at 23.) Defendant does not dispute that the IRS never even considered this rationale when it assessed the penalties. (*See* Mem. at 15 n.32.) The IRS's actual basis for imposing the AKG production payment penalties—that "the substance of the [ARDPSA] was that of an oil and gas

[30] For a summary of the penalties assessed for ExxonMobil's 2010 and 2011 tax years and ExxonMobil's defenses to those penalties, ExxonMobil refers the Court to the chart in ExxonMobil's opening brief. (Mem. at 13-14.)

[31] Defendant does not dispute—and therefore concedes—that the negligence penalty relating to AKG was unlawful and should be refunded. As for the disregard of rules and regulations penalty, Defendant identifies no evidence of "careless, reckless, or intentional disregard" of relevant authorities in connection with ExxonMobil's return positions. Treas. Reg. § 1.6662-3(b)(2). In any event, that penalty is also unlawful because ExxonMobil satisfies the reasonable basis plus adequate disclosure defense. (*See infra* at 20-23.)

lease for United States income tax purposes rather than a transaction involving a production payment"[32]—is foreclosed by the Court's prior ruling, and Defendant does not argue otherwise.

But even if the Court were to hold that some of the interest expense is allocable to the State of Qatar, ExxonMobil is still entitled to summary judgment because it satisfies two separate defenses to a substantial understatement penalty. Either defense is independently sufficient to render the penalty unlawful and to require a refund.

*First*, ExxonMobil satisfies the substantial authority defense. Contrary to Defendant's conclusory assertion that the partnership's allocation of the interest expense to ExxonMobil "lacked substantial authority" (Opp. at 25), this position is plainly supported by the text of Section 707(c) and the examples in the associated Treasury regulations. As described above, those authorities establish that where, as here, a partner receives only a Section 707(c) payment, that partner does not receive an allocation of other partnership items, including interest expense. *See* 26 U.S.C. § 707(c); Treas. Reg. § 1.707-1(c), Exs. 3 and 4. This easily meets the threshold for substantial authority, which is satisfied where the tax position is supported by "a well-reasoned construction of the applicable statutory provision." Treas. Reg. § 1.6662-4(d)(3)(ii).

*Second*, ExxonMobil satisfies the reasonable basis plus adequate disclosure defense. As to the first prong, Defendant does not—and cannot—dispute that ExxonMobil's return position had a reasonable basis.[33] (*See* Opp. at 25 (arguing only that "[r]easonable basis *alone* is not a defense; it must include adequate disclosure" (emphasis added)).)[34] Moreover, even if the

---

[32] Ex. 41 (2010-2011 Statutory Notice of Deficiency), App. 653, 681.

[33] Because there is a reasonable basis for ExxonMobil's return position, the negligence penalty does not apply. *See* Treas. Reg. § 1.6662-3(b)(1).

[34] Because ExxonMobil's return position satisfies the "more stringent" substantial authority defense described above, Treas. Reg. § 1.6662-4(d)(2), it necessarily satisfies the *less*
(….continued)

reasonable basis defense included a subjective component, the undisputed evidence demonstrates ExxonMobil's actual reliance on the relevant authorities.[35]

As to the second prong (adequate disclosure), Defendant summarily argues that "ExxonMobil presents no evidence" that it "adequately disclosed the AKG transaction." (*Id.*) That is not true: the relevant disclosures were made on ExxonMobil's Schedule M-3s, which were included with ExxonMobil's motion.[36] Defendant's assertion that "the regulations do not allow Schedule M-3s to satisfy the adequate disclosure requirement" (*id.* at 28) is also incorrect. Defendant acknowledges that disclosure must occur "on a Form 8275 *unless an applicable revenue procedure permits otherwise*." (*Id.* at 26 (quoting *Purple Heart Patient Ctr., Inc. v. Comm'r*, 121 T.C.M. (CCH) 1260 (2021) (emphasis added)).) Here, the applicable IRS annual Revenue Procedures prescribe that disclosure on a Schedule M-3 constitutes adequate disclosure for the purpose of this defense. *See* Treas. Reg. § 1.6662-4(f)(2); Rev. Proc. 2011-13, 2011-3 I.R.B. 318, § 4.02(3) (differences in book and income tax reporting may be disclosed on a Schedule M-3); Rev. Proc. 2012-15, 2012-7 I.R.B. 369, § 4.02(3) (same).

---

*stringent* reasonable basis standard as well. *See, e.g.*, *Burditt v. Comm'r*, 77 T.C.M. (CCH) 1767 (1999) (holding that petitioners had "substantial authority" for their return position, and because "the substantial authority standard of proof is more stringent than that of reasonable basis . . . we also find petitioners were not negligent with respect to the underpayment" (internal citation omitted)); *Chemtech Royalty Assocs., L.P. v. United States*, 823 F.3d 282, 290 (5th Cir. 2016) (same).

[35] *See* DX-32 (May 15, 2007 Babin memorandum), App. 278-80 (detailing tax reporting for the production payment, which specifically cites Section 707(c)). Indeed, the ARDPSA also expressly references Section 707(c), which further shows that ExxonMobil in fact relied on that provision. (JX-002 (ARDPSA) art. 39.14, App. 264.)

[36] *See* Ex. 34 (excerpts from ExxonMobil's 2010 Form 1120, Schedule M-3), App. 500-01; Ex. 36 (excerpts from ExxonMobil's 2010 Form 1120, Schedule M-3 statements), App. 512-23; Ex. 37 (excerpts from ExxonMobil's 2011 Form 1120, Schedule M-3), App. 526-27; Ex. 39 (excerpts from ExxonMobil's 2011 Form 1120, Schedule M-3 statements), App. 542-53; Ex. 6 (Declaration of William F. Rogers) ¶ 8, App. 93.

For these reasons, ExxonMobil is entitled to a refund of $51,009,333 for penalties that were assessed and paid in connection with the AKG production payment.[37]

### B. The Purchase Transaction and Change in Accounting Method Penalties Were Illegally Assessed and Should Be Refunded

ExxonMobil is also entitled to a refund of the purchase transaction and change in accounting method penalties. Defendant fails to show otherwise.

#### 1. The Negligence Penalties Are Unlawful Because ExxonMobil Satisfies the Reasonable Basis Defense, Including As a Consequence of This Court's Prior Decisions

As ExxonMobil established in its opening brief, the negligence penalties were erroneous because the Court previously concluded that ExxonMobil's return positions had a reasonable basis (which is a complete defense to negligence), and Defendant may not relitigate that issue now. (*See* Mem. at 16-19.)

In response, Defendant argues that the legal standard is different here because "reasonable basis" under Section 6662 includes a subjective component, whereas "reasonable basis" under Section 6676 (the provision at issue in the 2006-2009 Litigation) does not. (Opp. at 33-34.) But that argument is wrong. Reasonable basis means the same thing in both places.[38]

*First*, the text of the Treasury regulations confirms that the reasonable basis standard under Section 6662 is purely objective, just like the same defense under Section 6676. The

---

[37] Tax and Penalty Stipulation ¶ 10, App. 83; *see also* Addendum 1.

[38] As this Court explained, the IRS itself "has advised that 'reasonable basis' in section 6676 (before the 2015 amendment) has the same meaning as reasonable basis in section 6662." *Exxon Mobil Corp. v. United States*, 513 F. Supp. 3d 734, 736 (N.D. Tex. 2021), App. 60, *aff'd* 43 F.4th 424 (5th Cir. 2022); *id.* at 738, App. 62 ("Although reasonable basis is not defined, the IRS has stated that, because the § 6676 penalty is intended to supplement the § 6662 accuracy-based penalties, *it generally has the same meaning*." (emphasis added)). Defendant has no response to the fact that it is advocating for an interpretation of the reasonable basis defense that contradicts the IRS's own guidance.

Treasury regulations implementing Section 6662 provide that "[a] return position that has a reasonable basis . . . is not attributable to negligence." Treas. Reg. § 1.6662-3(b)(1). That language is clear: the question is whether the *return position* has a reasonable basis, not whether the *taxpayer* had a reasonable basis for the position that it adopted. Defendant has no response. Indeed, it does not engage with the text of the Treasury regulations at all.

*Second*, Defendant relies on a single, out-of-circuit case to support its interpretation: *Wells Fargo & Co. v. United States*, 957 F.3d 840 (8th Cir. 2020). (Opp. at 30-36.) But as ExxonMobil explained (*see* Mem. at 19 n.40), *Wells Fargo* is contrary to binding Fifth Circuit authority—including *Chemtech Royalty Associates, L.P. v. United States*, 823 F.3d at 289, where the Fifth Circuit held that a taxpayer's position lacked a "reasonable basis" under Section 6662 by looking solely to the "cited authorities" and determining that they were "materially distinguishable." Whether the taxpayer actually relied on those authorities was irrelevant and went unmentioned by the court.[39] The Eighth Circuit's approach is also contrary to the weight of authority on this issue. (*See* Mem. at 18-19 (compiling authorities).)

Because the reasonable basis defense under Section 6662 does not include a subjective component, this Court's prior conclusion that ExxonMobil satisfied the reasonable basis defense

[39] In *Chemtech* and elsewhere (*supra* note 34), the Fifth Circuit also explained that the reasonable basis standard exists on a continuum, and that substantial authority is "more stringent" than reasonable basis. 823 F.3d at 290; *see also Exxon Mobil Corp. v. United States*, 43 F.4th 424, 434 (5th Cir. 2022) (describing the reasonable basis standard as "relatively high but less stringent than other IRS standards like the substantial-authority standard"). Defendant's interpretation would subvert that continuum. If reasonable basis had a subjective component, then the substantial authority standard would not necessarily be more stringent than reasonable basis: a return position could satisfy the substantial authority standard—but fall short of the reasonable basis standard—if the taxpayer lacked evidence that it actually relied on the pertinent authorities. This is another respect in which Defendant's interpretation is contrary to binding Fifth Circuit precedent.

is dispositive here.[40] But even if Section 6662 were interpreted to include a subjective component, the Court's "reasonable basis" holding still has preclusive effect. The only additional question the Court would have to address is whether ExxonMobil consulted and relied on the authorities that provide the reasonable basis. The undisputed evidence shows that ExxonMobil "*actually relied* on the relevant legal authorities that form the reasonable basis for its position[s]." *Wells Fargo*, 957 F.3d at 854 (emphasis added). Defendant's arguments to the contrary have no merit.

*First*, with respect to the purchase issue, Defendant's assertion that ExxonMobil cannot prove actual reliance overlooks the Qatar and Malaysia protest submissions, which cite the pertinent legal authorities.[41] (*See* Mem. at 21 n.44.) Instead, Defendant devotes considerable attention to two other memoranda that *also* support ExxonMobil's position. (Opp. at 30-32.) But the protest submissions—which Defendant ignores altogether—are sufficient on their own.

*Second*, with respect to the change in accounting method issue, ExxonMobil's responses to IRS Information Document Requests ("IDR") requesting that ExxonMobil explain its tax return position on the issue identify the pertinent legal authorities. (*See* Mem. at 21.) Defendant has no response to that evidence. Indeed, the only reference to the IDR responses in Defendant's

[40] Defendant asserts that in the 2006-2009 Litigation, "[t]his Court understood . . . that the legal standard between § 6676 and § 6662 are [] different." (Opp. at 33 (cleaned up).) But the interpretation of "reasonable basis" under Section 6662 was not at issue in the 2006-2009 Litigation because no penalties had been imposed under Section 6662, and accordingly that issue was neither briefed by the parties nor decided by the Court.

[41] As Defendant concedes (Opp. at 32), the Fifth Circuit held that ExxonMobil's tax position was reasonably based on *Anderson v. Helvering*, 310 U.S. 404 (1940) and *Christie v. United States*, 436 F.2d 1216 (5th Cir. 1971), and both of those authorities were cited in ExxonMobil's protest submissions. *See* Ex. 22 (2006-2007 Qatar protest submission (citing *Anderson* and *Christie*)), App. 291-317; Ex. 23 (2006-2007 Malaysia protest submission (same)), App. 318-56.

Opposition is an argument that they "do not satisfy the *adequate disclosure* requirement." (Opp. at 38 (emphasis added).) But that is an entirely separate issue, and ExxonMobil never argued that the IDR responses satisfied the adequate disclosure requirement. As a result, ExxonMobil's showing that it actually relied on the pertinent authorities as to the change in accounting method issue is uncontested.[42] Further, Defendant's argument that ExxonMobil's change in accounting method argument "evolved" over time is irrelevant under Defendant's own subjective test. Under Defendant's own argument, ExxonMobil must only show "actual reliance" on the relevant law—not that it continued to articulate the argument the exact same way. (Opp. at 35, 38.) The evidence establishes that ExxonMobil has relied on the same key Treasury regulation that it relied on in the 2006-2009 Litigation. *See* Treas. Reg. § 1.446-1(e)(2).

For these reasons, ExxonMobil satisfies the reasonable basis defense regardless of how that standard is interpreted. The negligence penalties are unlawful and should be refunded.

#### 2. The Substantial Understatement and Disregard of Rules and Regulations Penalties Were Illegally Assessed Because ExxonMobil Satisfies the Reasonable Basis Plus Adequate Disclosure Defense

The substantial understatement *and* the disregard of rules and regulations penalties are unlawful because ExxonMobil satisfies the reasonable basis plus adequate disclosure defense.

[42] Defendant mischaracterizes the Court's prior decision in asserting that the Court "reflected that if § 6676 had a subjective element as § 6662 does, then it would hold that ExxonMobil lacked a reasonable basis for its Change in Accounting." (Opp. at 38.) Far from addressing what the Court *would have held* if the reasonable basis standard had a subjective component, the Court merely observed that "[b]ecause there is no subjective element to the reasonable basis inquiry," it did "not affect the Court's determination if Exxon Mobil articulated a different position in its pre-suit dealings with the IRS." *Exxon Mobil*, 513 F. Supp. 3d at 739 n.4, App. 64. Regardless, ExxonMobil's IDR responses—which evidence reliance on the pertinent authorities—were not before the Court in the 2006-2009 Tax Litigation; they are now (*see* Ex. 25 (Aug. 1, 2013 IDR response), App. 360-66; Ex. 26 (Aug. 15, 2014 IDR 321-IE response), App. 367-72), and they indisputably evidence ExxonMobil's actual reliance on the pertinent authorities.

(*See* Mem. at 19-20.) The reasonable basis prong is satisfied for the reasons explained above. (*See supra* at 17-20.) As for adequate disclosure, Defendant concedes that ExxonMobil *disclosed* the transactions on its 2010 and 2011 Schedule UTPs and 2011 15-day letter. (Opp. at 29.) Defendant's only response is that those disclosures were not *adequate*. *Id.* This argument fails.

For a disclosure on a Schedule UTP or 15-day letter to be adequate, a taxpayer need only disclose the "tax position" or the "potential controversy."[43] ExxonMobil's disclosures did precisely that. With respect to the Qatar transactions, Defendant concedes that ExxonMobil's 2010 and 2011 Schedule UTPs disclosed the very issue that was litigated in the 2006-2009 Litigation: "*whether the State of Qatar leased or sold the mineral property*." (Opp. at 29 (emphasis added).) As for the Malaysia transactions, Defendant's contention that "the Malaysian 15-day letter disclosure omits the Sale vs. Lease issue altogether" (Opp. at 29) is belied by the disclosure that "Petronas effectively sold mineral property interests to [ExxonMobil] in return for a right to receive contingent payments."[44]

Defendant argues that these disclosures lacked sufficient details about "the relationship and the tax treatment between the foreign tax credits and the Sale vs. Lease Classification" and "Malaysia and Qatar no longer retaining an economic interest in the mineral." (Opp. at 29.) But those are *consequences* of the purchase treatment—not factual details that "reasonably apprise"

[43] Rev. Proc. 2011-13, 2011-3 I.R.B. 318, § 3.07 (Schedule UTP 2010 return); Rev. Proc. 2012-15, 2012-7 I.R.B. 369, § 3.07 (Schedule UTP 2011 return); Rev. Proc. 94-69, 1994-2 C.B. 804, § 3.02 (2011 15-day letter).

[44] Ex. 24 (2011 15-day letter), App. 359.

the IRS of the basis for ExxonMobil's position—and Defendant fails to show otherwise.[45] In fact, the IRS itself *admitted* that ExxonMobil's disclosures were adequate by affirmatively checking the box on the penalty lead sheet indicating that ExxonMobil had adequate disclosure.[46] By disclosing its treatment of the Qatar and Malaysia transactions as purchases, ExxonMobil also necessarily disclosed the change in accounting method issue.

Finally, Defendant's argument that the Schedule M-3 disclosures "do not contain a detailed explanation of the relevant facts" (Opp. at 28) is meritless. The Revenue Procedures require only that a disclosure on a Schedule M-3 "reasonably apprise the Service of the potential controversy concerning the tax treatment of the item."[47] The IRS admitted during audit that "Taxpayer did make a disclosure on Schedule M-3" as permitted under the applicable Revenue Procedure.[48] Disclosure is sufficient if it "discloses facts sufficient to enable the [IRS] to identify the potential controversy."[49] Because purchase treatment and the change in accounting

---

[45] Rev. Proc. 2011-13, 2011-3 I.R.B. 318, § 4.02(3); Rev. Proc. 2012-15, 2012-7 I.R.B. 369, § 4.02(3). Similarly, the Schedule UTP instructions require only a "concise description" of the issue. 2010 Instructions for Schedule UTP at 1, 4, https://www.irs.gov/pub/irs-prior/i1120utp--2010.pdf; 2011 Instructions for Schedule UTP, at 1, 5, https://www.irs.gov/pub/irs-prior/i1120utp--2011.pdf.

[46] Ex. H2 (Penalty Approvals), Def.'s App. (ECF No. 204) at 841 (checking the box to indicate that ExxonMobil filed the Form 8275 or Form 8275-R based on the Schedule UTP).

[47] Rev. Proc. 2011-13, 2011-3 I.R.B. 318, § 4.02(3); Rev. Proc. 2012-15, 2012-7 I.R.B. 369, § 4.02(3).

[48] Ex. 28 (Form 886-A, *Explanation of Items*, Negligence, Disregard of Rules or Regulations), App. 379 ("Taxpayer did make a disclosure on Schedule M-3 for taxable year 2011, permissible under Rev. Proc. 2012-15 (which applies to taxable year 2011)."); Ex. 29 (Form 886-A, *Explanation of Items*, Substantial Understatement), App. 382 (same).

[49] S. Rep. No. 97-494, at 274 (1982).

method issue were adequately disclosed, as the IRS acknowledged, the adequate disclosure requirement is satisfied.

### 3. The Change in Accounting Method Penalties Were Illegally Assessed Because, At a Minimum, ExxonMobil Satisfies the Substantial Authority Defense

The penalties related to ExxonMobil's change from mineral lease to purchase treatment are erroneous for the additional reason that there was no change in accounting method requiring the Commissioner's consent in the first place. (*See* Mem. at 22-23.) At minimum, there is substantial authority for that position, which is a complete defense to the substantial understatement penalty. *See* 26 U.S.C. § 6662(d)(2)(B)(i); Treas. Reg. §§ 1.6662-4 (a), (d)(3)(i).

In response, Defendant argues that the Court previously concluded that ExxonMobil's position had only "colorable" support, which "does not rise to substantial authority." (Opp. at 36-37.) That misses the point. In the 2006-2009 Litigation, the Court did not need to address whether the substantial authority standard was satisfied, as it was sufficient to dispose of the change in accounting method penalties on the ground that ExxonMobil satisfied the reasonable basis standard. Thus, the Court did not reach the question of whether ExxonMobil's position *also* had substantial authority. As ExxonMobil explained here, it does.[50] (*See* Mem. at 22-23.) But even if the change from mineral lease to purchase treatment is considered a change in accounting method, penalties are still inappropriate because two of the entities never established a method of accounting such that a change would require the Commissioner's consent.[51]

---

[50] Moreover, ExxonMobil separately satisfies the adequate disclosure plus reasonable basis defense. (*See* Mem. at 27-29 (Addendum 1); *supra* at 20-23.) Thus, even if ExxonMobil does not satisfy the substantial authority defense as to the change in accounting method issue, the substantial understatement penalty is erroneous.

[51] *See* Treas. Reg. § 1.446-1(e)(2)(ii)(a); Rev. Rul. 90-38, 1990-1 C.B. 57; Rev. Proc. 97-27, 1997-1 C.B. 680.

* * *

Because Defendant fails to identify any genuine issue of fact that would preclude summary judgment in ExxonMobil's favor on the purchase transaction and change in accounting method penalties, ExxonMobil is owed a refund of $131,458,450 as to those penalties.[52]

**III. ExxonMobil Is Entitled to Summary Judgment on Its Claims for Interest**

Finally, ExxonMobil is entitled to a refund of interest that was erroneously collected by the IRS. The sole contested legal issue relates to deposits that ExxonMobil made for tax year 2009, that were ultimately applied as payments for tax year 2012, and that may be used to suspend underpayment interest for tax years 2010 and 2011 for the intervening period when the IRS had the free use of ExxonMobil's money. (*See* Mem. at 24-25.)

None of the facts are in dispute. ExxonMobil made the relevant deposits before March 15, 2013, and the IRS neither suspended underpayment interest nor paid any overpayment interest to ExxonMobil before March 15, 2013. (*Id.*) Therefore, as Defendant acknowledges, the government had the free use of those funds before then. (Opp. at 39.) Defendant does not dispute the general rule established by the Supreme Court and followed by the Fifth Circuit, which is that interest is assessed to compensate a creditor for periods in which it is deprived of the use of its money. (Mem. at 25; *see, e.g.*, *Manning v. Seeley Tube & Box Co.*, 338 U.S. 561, 566 (1950).)

In seeking to evade the "use-of-money" principle here, Defendant relies on Revenue Procedure 2005-18, 2005-13 I.R.B. 798, to assert that ExxonMobil was required to "specifically request" that the deposits be moved to tax years 2010 and 2011 before they were ultimately applied as payments for tax year 2012. (Opp. at 40.) Revenue Procedure 2005-18 allows the

[52] Tax and Penalty Stipulation ¶ 10, App. 83; *see also* Addendum 1.

transfer of deposits between tax periods but provides no further guidance on how underpayment interest is suspended in that situation. Therefore, the Revenue Procedure cannot override the "use-of-money" principle adopted by the Fifth Circuit. ExxonMobil should not be charged interest when the IRS had the free use of millions of dollars of ExxonMobil's money. Under the IRS's long-standing rules and principles, the IRS collects interest only when "the taxpayer has the use of the government's money." *See, e.g.*, Rev. Proc. 60-17, 1960-2 C.B. 942, § 2.01(1).

ExxonMobil's use of the 2012 Deposits to suspend underpayment interest for periods when the IRS continually possessed its funds is the same as in *Goldring v. United States*, 15 F.4th 639 (5th Cir. 2021). There, the overpayment did not reside in the tax year for which it suspended interest, and the Fifth Circuit expressly rejected the government's argument that money must reside in a tax account to suspend underpayment interest in that period. *Goldring*, 15 F.4th at 649. As in *Goldring*, Defendant "fixates on theoretical migration of . . . funds from one tax year to another" and "ignores the simple, undisputed fact that the IRS was never deprived of its use of the money." *Id*. Because Defendant was never "deprived of the use of the money," the IRS unlawfully collected interest for tax years 2010 and 2011. *Vick v. Phinney*, 414 F.2d 444, 448 (5th Cir. 1969).[53]

## **<u>CONCLUSION</u>**

For the reasons described above and the reasons set forth in ExxonMobil's opening brief, ExxonMobil's Motion should be granted in full.

---

[53] Defendant's other cases are inapposite. (Opp. at 39-41.) *Dillon Trust Company v. United States*, 162 Fed. Cl. 708, 720 (2022), *appeal docketed*, Fed. Cir. Dkt. No. 24-1314, involved the return of deposits at the taxpayer's request. ExxonMobil never requested a return of the 2012 Deposits. *Principal Life Insurance Company v. United States*, 95 Fed. Cl. 786, 802-03 (2010), addressed whether a taxpayer can designate a deposit as a payment before assessment. Here, the parties agree that the 2012 Deposits were deposits during the period of time when ExxonMobil seeks to use them to suspend underpayment interest for tax years 2010 and 2011.

Dated: July 21, 2025

DAVIS POLK & WARDWELL LLP

*/s/ James P. Rouhandeh*

James P. Rouhandeh*
rouhandeh@davispolk.com
Antonio J. Perez-Marques*
antonio.perez@davispolk.com
Lara Samet Buchwald*
lara.buchwald@davispolk.com
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Sean Stefanik*
sean.stefanik@davispolk.com
1050 17th St., NW
Washington, DC 20036
(202) 962-7000
* Admitted *pro hac vice*

HOLLAND & KNIGHT LLP

Emily A. Parker
State Bar No. 15482500
emily.parker@hklaw.com
Mary A. McNulty
State Bar No. 13839680
mary.mcnulty@hklaw.com
Leonora S. Meyercord
State Bar No. 24074711
lee.meyercord@hklaw.com
Dina W. McKenney
State Bar No. 24092809
dina.mckenney@hklaw.com
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 964-9501 (Fax)

*Attorneys for Plaintiff*
*Exxon Mobil Corporation*

**ADDENDUM 1**

The arithmetic underlying the numbers in ExxonMobil's motion for partial summary judgment and in its proposed order are set forth herein. Numbers in blue text are stipulated or otherwise undisputed.

For tax year 2010, the interest component of the production payments made by the AKG partnership to the State of Qatar totaled [redacted][1] For tax year 2011, the interest component of the production payments made by the AKG partnership to the State of Qatar totaled [redacted].[2]

The AKG partnership allocated 100% of the interest expense amounts to ExxonMobil.[3]

ExxonMobil's interest expense deduction is then apportioned between U.S. and foreign sources using the per return interest apportionment percentages.[4] The aggregate foreign and U.S. apportionment percentages for 2010 and 2011 are shown below:

---

[1] Tax and Penalty Stipulation ¶ 1, App. 80.

[2] *Id.* ¶ 2, App. 80.

[3] The parties dispute the allocation of the production payment interest expense amounts between ExxonMobil and the State of Qatar. *See id.* ¶ 3, App. 80; *see also supra* Section I.A.

[4] ExxonMobil understood that Defendant disputed whether the AKG partnership's production payment interest expense is considered related to all income-producing activities and assets of ExxonMobil. But Defendant never raised the issue on summary judgment and has waived that argument. Moreover, the parties agree that if the interest expense is considered related to all income producing activities and assets of ExxonMobil, the interest will be apportioned between U.S. and foreign sources using the agreed upon apportionment percentages. *See* Tax and Penalty Stipulation ¶ 4, App. 80-81; *see also supra* Section I.B.

| Table 2.1[5] | | |
|---|---|---|
| **Year** | **Foreign** | **U.S.** |
| 2010 | [redacted] | |
| 2011 | | |

The foreign apportionment percentage is further broken down among the following categories[6]:

| Table 2.2 | | | | | |
|---|---|---|---|---|---|
| **Year** | **Foreign Oil and Gas Extraction Income (FOGEI)** | **Foreign Oil-Related Income (FORI)** | **Non-Oil and Gas Income (NOGI)** | **Passive Income** | **Total** |
| 2010 | [redacted] | | | | |
| 2011 | | | | | |

The total amount of ExxonMobil's interest expense deduction and the specific amount of the interest expense apportioned to each category of foreign-source income and U.S. income is shown below.

[5] Tax and Penalty Stipulation ¶ 4(a), App. 81.

[6] *Id.* ¶ 4(b), App. 81.

| Table 2.3 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Categories[8] | | | | | |
| **Year** | **Total Interest[7]** | **Foreign Oil and Gas Extraction Income (FOGEI)** | **Foreign Oil-Related Income (FORI)** | **Non-Oil and Gas Income (NOGI)** | **Passive Income** | **U.S. Income** |
| 2010 | [redacted] | | | | | |
| 2011 | | | | | | |

The tax refund is determined by multiplying the interest deduction apportioned to passive and U.S.-source income by ExxonMobil's tax rate for 2010 and 2011 (35%).[9] This calculation is shown below.

| Table 2.4 | | |
|---|---|---|
| | **2010** | **2011** |
| Interest apportioned to U.S.-Source Income and Passive Income[10] | [redacted] | [redacted] |
| Multiplied by Tax Rate | 35% | 35% |
| Tax Refund[11] | [redacted] | [redacted] |

This refund is increased by the correlative section 199 adjustment. The total AKG refund is shown below:

---

[7] *Id.* ¶¶ 1-2, App. 80.

[8] The subtotals for the five Categories listed in Table 2.3 are the product of the agreed percentages in Tables 2.1 and 2.2 and the agreed total interest in Table 2.3. The subtotals for 2011 above are accurate although slightly different from the product of Tables 2.1, 2.2, and 2.3 due to rounding in the percentages for 2011.

[9] *Id.* ¶ 5, App. 82.

[10] This row is the sum of totals for U.S. income and Passive income in Table 2.3.

[11] This row is the product of the first row in Table 2.4 and the agreed tax rate.

| Table 2.5 | | |
|---|---|---|
| | **2010** | **2011** |
| Tax refund from AKG | $129,814,944 | $143,621,810 |
| Tax refund from 199 AKG interest apportionment correction | $0 | $526,139 |
| Total AKG tax refund | $129,814,944 | $144,147,949 |

The total penalties assessed and paid by ExxonMobil for tax years 2010 and 2011 are as follows:

| Table 2.6[12] | | | |
|---|---|---|---|
| | **2010** | **2011** | **Total[13]** |
| AKG production payment penalties | $25,962,989 | $25,046,344 | $51,009,333 |
| Qatar and Malaysia DFA/PSC penalties | $22,101,644 | $109,356,806 | $131,458,450 |
| Total penalties | $48,064,633 | $134,403,150 | $182,467,783 |

The IRS also failed to reverse the disallowed purchase v. mineral lease interest from the section 199 calculation. When the disallowed interest expense is removed from the section 199 calculation, the deduction for section 199 domestic production activities increases. The refund resulting from the purchase v. lease interest reversal in the section 199 calculation for 2010 and 2011 is set forth in the table below:

[12] *Id.* ¶ 10, App. 83.

[13] The total is the sum of the agreed-upon penalty amounts for tax year 2010 and the agreed-upon penalty amounts for tax year 2011.

| Table 2.7[14] | | |
|---|---|---|
| | **2010** | **2011** |
| Tax refund from 199 purchase v. lease interest reversal | $6,373,074 | $37,132,569 |

The total tax and penalty refunds to which ExxonMobil is entitled are set forth below:

| | **2010** | **2011** |
|---|---|---|
| Total AKG tax refund[15] | $129,814,944 | $143,621,810 |
| Tax refund from 199 AKG interest apportionment correction[16] | $0 | $526,139 |
| Tax refund from 199 purchase v. lease interest reversal[17] | $6,373,074 | $37,132,569 |
| AKG penalties[18] | $25,962,989 | $25,046,344 |
| Qatar and Malaysia purchase v. lease penalties[19] | $22,101,644 | $109,356,806 |
| **Total** | **$184,252,651** | **$315,683,668** |

Interest computations are not addressed herein but are largely agreed between the parties and final calculations will be prepared following entry of the Court's decision.

[14] *Id.* ¶ 9, App. 82-83.

[15] *See supra* Table 2.4.

[16] *See supra* Table 2.5.

[17] *See supra* Table 2.7.

[18] *See supra* Table 2.6.

[19] *See supra* Table 2.6.

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was filed and served electronically through ECF on July 21, 2025, which gave notice to all counsel of record.

*/s/ James P. Rouhandeh*
James P. Rouhandeh