IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORP., | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:22-CV-0515-N |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

This Order[1] addresses the parties' cross-motions for summary judgment. [202, 205] [232] is moot. The Court has already ruled following the Phase I trial that ExxonMobil is entitled to a deduction for "mortgage interest" for the production payments. The parties appear to agree that this finding did not resolve the issue of how that deduction should be allocated between ExxonMobil and the State of Qatar, and also agree that the allocation can be resolved on summary judgment, rather than requiring further evidentiary proceedings. The Court holds that ExxonMobil's allocation position is correct and therefore grants its motion and denies the government's motion.

ExxonMobil successfully persuaded the Court that judicial economy would be served by bifurcating the issue of ExxonMobil's entitlement to a deduction for production payments from mere "computation" issues relating to calculating the actual numbers that

[1] This Order assumes the reader's familiarity with the Court's Findings of Fact and Conclusions of Law [191] [*hereinafter* FFCL], and will adopt the same abbreviations as used in the FFCL.

will go in the judgment. *See* Order (Sep. 6, 2023) [50] (the "Bifurcation Order"). "The key issue in this case is whether ExxonMobil is entitled to a tax deduction for alleged AKG production payments. To answer that question the Court must determine whether AKG is a valid partnership under federal law and whether the transactions in question are production payments for federal tax purposes, which would entitle ExxonMobil to a tax deduction." *Id.* at 2.

The first phase bench trial took place on April 15-19, 2024. On October 30, 2024, the Court entered its FFCL. The FFCL concluded: "ExxonMobil has established that it was lawfully entitled to deduct interest expense for production payments made to the State of Qatar." FFCL at 39. The Court thought, naively as it turns out, that the parties would get their accountants together in the same room and in an hour or two hammer out a final judgment approved as to form only. The court now turns to the allocation issues.

## I. THE PRODUCTION PAYMENT INTEREST EXPENSE IS PROPERLY ALLOCATED TO EXXONMOBIL

IRC § 707(c) provides:

> To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).

As the Court found in its FFCL:

> The parties also incorporated the production payment into the ARDPSA. The production payment recapitalized the State of Qatar's equity interest in the partnership. Rather than taking solely a profit share, as it did under the DPSA, the State of Qatar took a reduced profit share (called the "Residual Profit Share") and a production payment. The production payment was carved out of all the mineral interests held by the Al Khaleej Gas

> partnership (i.e., the mineral rights that the State of Qatar originally contributed in the DPSA, plus the additional mineral rights contributed in the ARDPSA). Thus, the State of Qatar redeemed part of its equity interest in Al Khaleej Gas in exchange for debt (the production payment), and that debt burdened the mineral interests contributed to the partnership by the State of Qatar under both the DPSA and the ARDPSA.

FFCL at 11 ¶ 30.

In Art. 39.14 of the ARDPSA. the parties agreed between themselves that the Residual Profit Share would be treated as a payment pursuant to section 707(c) of the Tax Code.[2]

Section 707(c) has three requirements, all of which the Residual Profit Share payments meet. First, the Residual Profit Share is a payment to a partner, i.e., the State of Qatar. Second, the Residual Profit Share payments are for the use of capital, that is, for the use of the minerals that the State of Qatar contributed to the partnership. Third, the Residual Profit Share payments are made "without regard to the income of the partnership." IRC § 707(c). This is illustrated in the table in Article 19.8.1 of the ARDPSA: as the volume of production increases (moving down the chart) Qatar's share of Profit Petroleum increases, and as the value of production increases (moving left to right across the table) Qatar's share of Profit Petroleum also increases. As volume and price increase, the Residual Profit Share increases even if partnership income remains the same.[3] Thus the Residual Profit Share payments qualify under section 707(c).

---

[2] Of course the parties' agreement in the ARDPSA does not control this Court's decision, but it is of historic interest.

[3] The government argues that volume and price are related to income, which while true is irrelevant. That does not mean that the Profit Share is determined with regard to income. *See* IRC § 707(c). This is further borne out by the fact that in the third and fourth quarters

Under the ARDPSA, the Residual Profit Share payments are the only payments the State of Qatar receives in its capacity as a partner (as opposed to a lender). Under section 707(c), payments do not carry a distributive share of partnership items. *See* Treas. Reg. 1.707-1(c). Because the Residual Profit Share payments are the only payments that the State of Qatar receives as a partner, it gets no distributive share of the interest expense. Thus, AKG properly allocated 100% of the interest expense from production payments to ExxonMobil, as it is the only partner that receives a distributive share.[4]

In opposition, the government argues that ExxonMobil's current position conflicts with its Phase I trial position that AKG is a partnership. That argument confuses two distinct issues. Whether the State of Qatar shared in AKG's profits was the issue decided in the Phase I trial. That is a question distinct from whether the Residual Profit Share is determined without regards to AKG's income, and therefore qualifies as a section 707(c) payment. The government's argument assumes that a payment cannot be both a share of profits and a payment under section 707(c). But there is nothing in the plain language of section 707(c) that requires that distinction, and the Court declines to write in judicially a requirement not found in the statutory text.

Accordingly, the Court grants ExxonMobil's motion and denies the government's motion.

---

of 2007, the AKG partnership had no net income, but the State of Qatar still received its Residual Profit Share. *See* PX-191, 192.

[4] ExxonMobil also argues in its motion that the interest expense is properly apportioned among ExxonMobil's domestic and foreign source income. *See* ExxonMobil Br. at 10. The government does not contest that issue, so the Court will not discuss it.

## CONCLUSION

It appears to the Court that in view of its ruling on the production payment deduction, there is no need to address the interest and penalty issues. If the Court misunderstands that, it requests the parties to advise it in writing of why those issues are still requiring judicial resolution within fourteen (14) days of the date of this Order.

If no further judicial action is required, the parties are directed to confer regarding the form of judgment. If the parties are unable to agree as to the form of judgment, then each party shall provide its position and proposed form of judgment to the Court in writing within twenty-eight (28) days of the date of this Order.

Signed September 17, 2026.

David C. Godbey
Senior United States District Judge